UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                  Plaintiff,        )
                                    )
     VS.                            ) No. 4:14-CR-393(ERW)
                                    )
BRIAN PALUCH,                       )  EXCERPTED TESTIMONY OF
                                    )    CHRISTIE JUDD
                  Defendant.        )
_____)


JURY TRIAL PROCEEDINGS -- VOLUME III
BEFORE THE HONORABLE E. RICHARD WEBBER
August 5, 2015
ST. LOUIS, MISSOURI


FOR THE PLAINTIFF:

     JOHN J. WARE
     DIANNA R. COLLINS
     OFFICE OF U.S. ATTORNEY
     111 South Tenth Street, Suite 2000
     St. Louis, MO  63102
     (314) 539-2200

FOR THE DEFENDANT:

     LUKE A. BAUMSTARK
     BURTON H. SHOSTAK
     COSGROVE LAW GOUP, LLC
     7733 Forsyth Boulevard, Suite 1675
     St. Louis, MO  63105
     (314) 563-2490


     Proceedings recorded by mechanical stenography;
transcript produced by computer.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

```
 1   (The following is the excerpted testimony of CHRISTIE JUDD

 2   reported on August 5, 2015, in re:  USA v. BRIAN PALUCH; Cause

 3   No. 4:14-CR-393(ERW):)

 4             THE COURT:  You may call your next witness.

 5             MS. COLLINS:  The Government calls Ms. Christie Judd.

 6             THE COURT:  Good morning.  Would you raise your right

 7   hand?

 8        (The Witness, CHRISTIE JUDD, Is Sworn.)

 9             THE COURT:  You may inquire.

10                       DIRECT EXAMINATION

11   QUESTIONS BY MS. COLLINS:

12   Q    Ms. Judd, how are you employed?

13   A    I am currently employed as the Vice-President of Human

14   Resources at PARIC.

15   Q    And how long have you had the title of Vice-President of

16   Human Resources?

17   A    About a year.

18   Q    Okay.  And prior to being Vice-President of Human

19   Resources, what was your position?

20   A    Director of Human Resources.

21   Q    So you got promoted?

22   A    I did.

23   Q    As the Director of Human Resources -- Was there a

24   Vice-President of Human Resources or at that time was the

25   Director the highest level?
```

1    A    That was the highest level.

2    Q    As the Director of Human Resources, what were some of

3    your duties and responsibilities?

4    A    Day-to-day responsibilities included recruiting and

5    training development, still a lot of employee relations

6    issues, overseeing the activities of a traditional HR

7    Department.

8    Q    And how long were you the Director of Human Resources?

9    What was the timeframe?

10   A    I started with PARIC in 2007 -- in 2007, and I was the

11   Director there for a couple of years.  I left and came back

12   and was the Director for a year and a half, roughly.

13   Q    As the Director of Human Resources, who did you report

14   to?

15   A    Brian Paluch.

16   Q    Now was Brian already the CFO when you were hired in as

17   the Director of Human Resources?

18   A    Yes.

19   Q    So you immediately started reporting to him at that time?

20   A    Correct.

21   Q    Do you see Mr. Paluch in the courtroom today?

22   A    I do.

23   Q    Can you identify what he's wearing?

24   A    A black coat and burgundy tie.

25         MS. COLLINS:  Your Honor, may the record reflect that

1   she identified the Defendant, please?

2         THE COURT:  Well, except one of the -- one of the

3   witnesses is color blind.  I don't know which one.  I think

4   someone said he had a blue coat on.  But is that he that ---

5   Q    (By Ms. Collins)  Can you identify him a little bit more?

6   Is he wearing glasses or not wearing glasses?

7   A    He's wearing glasses, and it might be charcoal gray.

8         THE COURT:  Okay.  It's fine.  I'm just -- That's

9   fine.  Okay.  She has identified him.

10        MS. COLLINS:  Okay.  Thank you.

11  Q    (By Ms. Collins)  Now, Ms. Judd, at some point in 2014

12  PARIC made the decision that it was going to terminate the

13  employment of Mr. Paluch.  Is that correct?

14  A    Correct.

15  Q    Okay.  So leading up to the actual separation of

16  Mr. Paluch and PARIC, what were some of the things that you

17  were involved with with PARIC, trying to accomplish?

18  A    Are you asking what my responsibilities were --

19  Q    What were your --

20  A    -- at the time?

21  Q    -- responsibilities for leading up to the -- to the

22  firing meeting, if you will?

23  A    I was in communication with our attorney at the time.

24  Q    Okay.  And -- And that was for some of the things that

25  you had received after he was terminated, correct?

```
 1   A    Just it's a traditional practice when we separate
 2   employees, that we make sure that there aren't any issues that
 3   we haven't considered or, you know, laws that we may not be up
 4   to speed on.  So we don't -- we don't do a lot of
 5   terminations, so we always run -- run it past our attorney.
 6   Q    Okay.  And so after speaking with your attorney, PARIC
 7   moved forward with the termination, and that was in February
 8   of 2014.  Is that correct?
 9   A    Correct.
10   Q    Who was current or who was present at that termination
11   meeting?
12   A    Joe McKee, Brian and myself.
13   Q    Was there anyone else?
14   A    No.
15   Q    Was there anyone from a security firm?
16   A    Outside of the meeting?
17   Q    Yes.
18   A    Yes.
19   Q    Standing outside of the meeting?
20   A    Correct.
21   Q    So inside the meeting is you, Mr. Paluch, Joe McKee.
22   Standing outside is someone from a security firm.
23   A    Correct.
24   Q    After the meeting in which it was discussed that
25   Mr. Paluch would, indeed, be terminated, was he then escorted
```

1   out of the building?

2   A    He was.

3   Q    Okay.  Did an issue arise regarding his computers?

4   A    Yes.

5   Q    And what was that issue?

6   A    The issue was that PARIC was unaware or Joe McKee was

7   unaware that there was a second computer that existed at

8   Brian's home.

9   Q    And was he asked to retrieve that computer?

10  A    Yes.

11  Q    And what did Mr. Paluch say or do?

12  A    At the time during the dismissal he said he would have a

13  hard time getting that second computer that day and was asked

14  that -- told that we had a security person who was going to

15  walk him out who could follow him and retrieve the computer

16  from his home.

17  Q    Do you remember where he said the second computer was at?

18  A    I believe he said originally that it was at his home.  I

19  believe that's what he said.

20  Q    Okay.  And then PARIC had its security guard follow him

21  to wherever the computer was located and retrieve it.  Is that

22  correct?

23  A    I believe they ended up actually receiving the

24  computer -- Brian gave the computer to the security person

25  from his daughter's condo or apartment in Brentwood.

1    Q    Okay.  Now immediately following Mr. Paluch's exit, were

2    you and another individual charged with cleaning up some of

3    his personal items?

4    A    Yes.

5    Q    Who -- Who did you work with on that?

6    A    Denise Korte, our HR Manager, and I did that.

7    Q    And what were you guys doing?

8    A    We started really mainly just looking for any of Brian's

9    personal items so that we could send them by courier to his

10   home the next day.

11   Q    And this is at his desk?

12   A    This is in his office at his desk, credenza.  You know,

13   there's a few different pieces of the desk, but, yeah, we were

14   in his office looking for his personal items to -- to send

15   them the next day.

16   Q    Now help me understand.  PARIC -- Are there actual

17   offices or are there --

18   A    Yeah.

19   Q    -- cubicles?

20   A    We have a pretty open environment, so the only real

21   office that exists is -- We have one office.  The rest of them

22   have higher cubicle walls which would be for the executive

23   team members.  And then the rest of the office has a lot of

24   collaborative space and low cubicle walls.

25   Q    So the one office that you have, who -- whose office is

1    that?

2    A    Joe McKee.

3    Q    And then the higher cubicles you said are for the

4    executives.

5    A    Yes.

6    Q    Would Mr. Paluch have had a higher cubicle?

7    A    Yes.

8    Q    So you're inside the cubicle --

9    A    Correct.

10   Q    -- looking for his personal items?

11   A    Right.

12   Q    Okay.  Is it a pretty neat cubicle or are things kind of

13   messy?

14   A    There was a lot in there.  There was a lot to go through;

15   a lot of stacks of papers and a lot in piles on different

16   parts of the desk and credenza and the return.  So there was a

17   lot to go through.

18   Q    So as you're looking for the personal items, what are you

19   doing with the -- with the business items or papers that

20   looked like they might be of some importance?

21   A    I was looking for anything that maybe needed immediate

22   attention that was either -- required his signature right away

23   or things that I could quickly identify that would possibly

24   hold up the business or a project or something for an

25   employee.  So I was looking for those items.  And things that

1    didn't pop out to me as needing immediate attention or that I

2    wasn't sure what to do with, I just started to put things in a

3    box, in a carton.

4    Q     And when you put things in a box, at some point federal

5    investigators asked you for the items that you had pulled from

6    Mr. Paluch's desk.  Is that correct?

7    A     Yes.

8    Q     And you gave the federal investigators the box.  Is that

9    correct?

10   A     Yes.

11   Q     Okay.  Take a look at what's been marked as Government's

12   Exhibit 20.  It's sitting next to you.  Is that the box that

13   you put everything in and then gave it to a federal

14   investigator?

15   A     It looks like it, yeah.

16   Q     Okay.

17          MS. COLLINS:  Your Honor, I ask for the admittance of

18   Government's Exhibit 20.

19          THE COURT:  And it's just a banker box.  Is that the

20   way you would describe it?

21          MS. COLLINS:  Sure; a banker box of items found on

22   B.P.'s desk.

23          THE COURT:  Okay, received.  Just the exterior?  Not

24   the contents, correct?  Or are you offering the contents?

25          MS. COLLINS:  I'm offering the contents as well.

```
 1              THE COURT:  Okay.  Were those returned to him or are

 2    they -- I don't understand exactly.  Could you describe it a

 3    little bit so we get the --

 4              MS. COLLINS:  Sure.

 5              THE COURT:  -- items identified properly?

 6    Q    (By Ms. Collins)  As you were cleaning out his cubicle

 7    and the items that you found that you thought were of somewhat

 8    important, you put them in a banker box.  Is that correct?

 9    A    Correct.

10              MS. COLLINS:  Do you ---

11              THE COURT:  Okay.  Are we going to be looking at the

12    items?

13              Here's the problem.  Once the box leaves and a

14    dispute arises as to what's in the box, then there's a

15    problem.  Are we going to be looking at individual --

16              MS. COLLINS:  Sure.

17              THE COURT:  -- pieces?

18              MS. COLLINS:  The items that we are going to

19    individually talk about, I have subgrouped.  I have separate

20    folders.

21              THE COURT:  Okay, very well.  Thank you.  No. 20, the

22    box is received.

23    Q    (By Ms. Collins)  So you're putting the items into this

24    banker box.  Are you really looking at the items at that point

25    or are you just -- What are you focused on?
```

1    A    No.  I was focused on, as I said, pulling together any of

2    his personal items so I could return those to him the next day

3    and then also for anything that looked like it was requiring

4    an immediate action.  So that other items would go into the

5    box that I didn't either recognize what they were or that they

6    were -- probably appeared to be for future filing or it just

7    didn't look urgent at the time.

8    Q    Now at some point later in time you began to look at the

9    items that were in Box 20 with a little bit more detail.  Is

10   that correct?

11   A    Correct.

12   Q    And why -- why would you do that?

13   A    As we began to identify information that appeared to be

14   questionable after the separation, as we sort of began the

15   investigation, I went back through the box either to find

16   things now that I had a different lens that I was looking

17   through that maybe I didn't notice before.  Is there anything

18   that I've overlooked or are there statements or documents in

19   there that would complete the scope of that particular search,

20   I guess.

21   Q    Now you said looking through the box as -- in part of --

22   looking for things that were questionable and part of an

23   internal investigation.  We were just at a point of time where

24   we were talking about Mr. Paluch's exit, and you were looking

25   for items on his desk that were personal, and now we've jumped

1   to an internal investigation.  What happened in between

2   Mr. Paluch leaving the company and the start -- and which

3   required or initiated the start of an internal investigation

4   on PARIC's part?

5   A    It was directed by Griffin personnel who provided the

6   security escort for the day of the termination who collected

7   the computers, both Brian's laptop that was in the office as

8   well as the one he returned to the security guy.  And

9   apparently during the forensic review of those two computers,

10  there were documents that had been saved in Brian's personal

11  file on the computers that were questionable in Tom Griffin's

12  mind.

13  Q    So outside of the documents that were questionable in the

14  forensic analyst's mind, was there behavior on the part of

15  Mr. Paluch that was questionable or curious on the day of his

16  termination that you thought was -- was odd?

17  A    Yes.  I've done probably -- I don't know -- 75

18  terminations, and although they're usually uncomfortable, this

19  one was unique in my mind.

20  Q    How so?

21  A    Well, obviously, there's initial shock that, I think, a

22  lot of people feel because they're not ready for it a lot of

23  the times.  And then at one point Brian said that we needed to

24  call the police if we thought that he was going to leave the

25  office.  And then he became appreciative of how we treated

1  him, and then he kind of became, you know, just angry.  And

2  that's when Joe McKee and I stood up and just said, "You know,

3  I'm sorry it had to be like this.  And Tom Jost, the escort,

4  is here to help you to your desk."  And Joe and Tom took Brian

5  back to his office.

6  Q    Is that normal in your -- in your 75 or so terminations

7  that you've done?  Are the employees normally allowed to go

8  back to their desk?

9  A    Usually we try to get the items that they will need,

10  their coat, their keys, their bag, and have it waiting so that

11  it doesn't have to be an awkward walk back to their work

12  station for themselves and their co-workers.  And then we'll

13  follow up the very next day and make sure all of their

14  personal items are delivered to them.

15  Q    Why did Mr. Paluch say that he needed to go back to his

16  desk area?

17  A    He said he needed to get some things, and we said, "Your

18  coat and your keys are right here."  And he said, "I need to

19  get some things," and started walking back towards his office.

20  And at that point I didn't go any further.  It was Joe McKee

21  and Tom Jost that walked back to his office with him.

22  Q    Okay.  Now as part of PARIC's internal investigation,

23  were you the one that was pulling a lot of the documents and

24  analyzing them?

25  A    Yes.

1   Q    Okay.  And as part of -- Well, let me ask you:  What were

2   you looking for?

3   A    In the beginning I was asked to look for documents that

4   would reveal that there was possibly misappropriation of money

5   or was anything affected by Brian.  He was, you know, acting

6   atypical at the time of his termination, and I think it just

7   felt funny to people at the time.  And so in part with the

8   forensic computer review and his behavior, I don't know that

9   we were looking specifically for a list of documents.  They

10  said look for anything that would, you know, have to do with

11  your medical benefits or things that he controlled

12  exclusively, and so that's -- that's where I started.  I

13  started looking at medical information.  I was asked to pull

14  American Express statements, his expense reports, anything

15  related to documents that he would have signed.

16  Q    So looking at documents and accounts that he had sole or

17  majority control over to see if there was misappropriation?

18  A    Yes.

19  Q    And what did you do with your findings?

20  A    As I found things, I let Joe McKee, our President, or --

21  excuse me -- CEO, know what we were discovering and as we

22  discovered it, so it was kind of a daily update with Joe.

23  Q    Now as you're finding things and you're updating the

24  President, is there a dollar amount that you care about or are

25  you just looking for any and everything?

```
 1   A    I don't -- I wouldn't say we looked for things that -- I

 2   wasn't looking for something that related to a high-dollar or

 3   low-dollar amount.  I was just looking to see what was there

 4   and didn't know what was there or what to look for.  I had

 5   never been through a, you know, search like that.  So I was

 6   just looking at everything I came across to see if I could put

 7   together a process that was followed or something that we

 8   missed or who else I maybe needed to ask for backup.

 9   Q    So of the items that you're looking at, high -- high

10   amounts, low amounts, is it fair that everything was important

11   to PARIC at that time?

12   A    It was.  I tracked dollar value on things as low as three

13   or four dollars up to, you know, probably several thousand

14   dollars.

15   Q    Now three to four dollars up to a thousand dollars, with

16   PARIC being such a large company, we've heard that it's one of

17   maybe the largest construction companies in the St. Louis

18   Area.  Why is it important if it's a three- or four-dollar

19   misappropriation?  Why does PARIC care?

20   A    Well, it -- I mean it's -- If somebody had been taking

21   money or had been abusing their responsibilities, it's

22   important because that goes against who we are as an

23   organization.  I mean that's -- that shouldn't be tolerated.

24   So I wasn't focused on the dollar amount.  I was focused on

25   what has happened here.  Is this something that affects our
```

1    employees?  Does it have to do with money to them?  Does it

2    have to do with, you know, subcontractors or could it

3    potentially tarnish our reputation in the community?  I mean

4    there's a lot of, you know -- Construction doesn't exactly

5    have the best connotation in some people's mind, anyway.  And

6    so if we are tainted in any way, that could affect our future

7    project work or, you know, potentially employment for people.

8    We didn't know the scope of it, so everything was important.

9              MS. COLLINS:  Your Honor, may I approach --

10             THE COURT:  Sure.

11             MS. COLLINS:  -- to take something out?

12   Q    (By Ms. Collins)  So during -- At some point after

13   Mr. Paluch's termination, you're beginning to go through

14   what's listed as Government's Exhibit 20 which is the items

15   from Mr. Paluch's desk, correct?

16   A    Yes.

17   Q    Okay.  Let's look at some of the items that you found on

18   his desk.  I'm going to first show you what is marked as

19   Government's Exhibit 20-A, and it's a December 30th of 2013

20   expense report sheet.  Do you recall finding this expense

21   report and noticing it?

22             MS. COLLINS:  The jury can see this.  This has been

23   admitted.

24             THE COURT:  Oh, I thought -- Is the jury monitor on?

25   It's off.

```
1              MS. COLLINS:  It's off.  Just the seal is on.

2              THE COURT:  This hasn't been received yet?

3              MS. COLLINS:  Yes.  It's part of 20.

4              THE COURT:  Oh, everything?  See, that was my

5    problem.  I don't know.  Can we just take them one at a time?

6              MS. COLLINS:  Oh, okay.  Sure.

7              THE COURT:  20-A is what?  How would you identify it?

8    As the expense report?

9              MS. COLLINS:  December 30th, 2013, expense report.

10             THE COURT:  And you're offering it now?

11             MS. COLLINS:  Yes, I will offer 20-A as an exhibit.

12             THE COURT:  Okay.  Okay, received.

13             JUROR NO. 10:  Your Honor, before we proceed, is it

14   possible to have a short recess?

15             THE COURT:  Yes, we can.

16             Until the case is given to you to decide, do not

17   discuss it among yourselves or with others or remain in the

18   presence of anyone discussing it.

19             Since you're only going to be in the Jury Room, I

20   will not give you the balance of that long recitation.

21             Court's in recess for ten minutes.

22             (Court recessed from 11:07 AM until 11:16 AM.)

23             (Jury seated by the Clerk.)

24             THE COURT:  Please be seated.

25             You may continue whenever you're ready.
```

1           MS. COLLINS:  Okay.

2           CONTINUED DIRECT EXAMINATION OF CHRISTIE JUDD

3    QUESTIONS BY MS. COLLINS:

4    Q    Ms. Judd, we were looking at an expense report that was

5    marked as Government's Exhibit 20-A.

6           MS. COLLINS:  Did I move for its admittance right

7    before our break?

8           THE COURT:  Yes.  It's received.

9           MS. COLLINS:  Okay.

10   Q    (By Ms. Collins)  Is this one of the items that you found

11   on Mr. Paluch's desk?

12   A    Yes.

13   Q    Okay.  And then you also found a second sheet of paper

14   that looks to appear to be the same expense report with the

15   same date and a signature, correct?

16   A    Yes.

17   Q    Okay.  Now what, if anything, was odd about having two

18   pieces of paper that appear to be exactly the same?

19   A    What was strange about those documents is the one has the

20   same signature that was on a piece of paper taped to the

21   expense report.

22   Q    So it appears as if the document that has the

23   Government's Exhibit 20-A sticker on it that's in my left hand

24   actually has a taped signature on it.

25   A    Yes.

1    Q     And you can actually still see the tape, the Scotch tape

2    on it, correct?

3    A     Right.

4    Q     And then it appears as if the second document was a

5    photocopy where now you don't see the tape; tape/no tape.

6    A     Yes.

7    Q     And whose signature does this appear to be?

8    A     That appears to be Joe McKee's signature.

9    Q     So the document that's got the Government's Exhibit 20-A

10   on it is a cut -- taped signature of your President,

11   Joe McKee?

12   A     Yes.

13   Q     Did you find that to be curious?

14   A     I did.

15   Q     Why?

16   A     I -- Why would you have a document that was identical

17   except one had a taped piece of paper with his signature and

18   the other one was the same document.  And when I held it up on

19   top of each other, it was an overlay.  So it felt to me that,

20   you know, he had tried to make sure that it looked like Joe's

21   approval was on that expense report.

22         MS. COLLINS:  Your Honor, this is not admitted.

23         THE COURT:  I'm sorry?

24         MS. COLLINS:  I just need to show this just to

25   Ms. Judd.  We're moving to Government's Exhibit 20-B --

1        THE COURT:  Okay.

2        MS. COLLINS:  -- which we will call "practice

3   signatures."

4        THE COURT:  Okay.

5   Q    (By Ms. Collins)  Do you recall seeing this document as

6   well?

7   A    Yes.

8   Q    And this was a document that you found on his desk and

9   you put into Government's Exhibit 20?

10  A    Correct.

11       MS. COLLINS:  Your Honor, I move for the admittance

12  of Government's Exhibit 20-B, the practice signatures.

13       THE COURT:  Received.

14  Q    (By Ms. Collins)  Ms. Judd, was this also a document that

15  you found on the Defendant's desk?

16  A    Yes.

17  Q    Did you find this to be curious?

18  A    I did.

19  Q    Why?

20  A    Why would you be practicing the signature of your

21  President at the bottom of a -- of an American Express

22  statement or doodling.  It just seemed ---

23  Q    It just seemed odd?

24  A    It just seemed odd.

25  Q    And whose signature does this appear to be the practice

1    of?

2    A    Brian Paluch's signature is on there.  The word "Okay" is

3    on there, and then it appears that Joe's signature was being

4    attempted several times.

5    Q    Now are you familiar with some of the perks that

6    executives at PARIC receive?

7    A    Yes.

8    Q    As part of the Director of Human Resources, you would --

9    you would know that, right?

10   A    Yes.

11   Q    And what -- what are some of them?

12   A    Some of the perks would be club memberships.  And these

13   aren't necessarily for everyone, but -- so club memberships,

14   Waterway carwash annual memberships, and then a lot of the

15   perks that they received would be similar to what our other

16   employees receive, but those are the two that jump out to me

17   as being more unique for the executive team.

18   Q    Now you said Waterway memberships.  Do just the

19   executives get Waterway memberships or is that something that

20   maybe some of your field engineers would get as well?

21   A    The club membership is available to -- or was.  We don't

22   do it any longer; was available to all of our employees.  The

23   difference between the executives and the employees was that

24   the executives had their annual membership covered by the

25   company.  So the company paid for the cost of that membership,

1    and then we allowed our employees to buy into that discounted

2    membership price.  So we would do payroll deductions for our

3    employees who wanted to purchase that discounted membership

4    package.

5    Q    Now is that something within PARIC that Ms. Jordan

6    Hemmann is in charge of?

7    A    I don't know if I would say she was in charge of it.  I

8    think she helped to administer it, but the program, from what

9    I remember, was a program that Brian oversaw, but Jordan

10   worked for Brian.

11   Q    Okay.  And did Jordan report to Mr. Paluch?

12   A    Yes.

13   Q    I'm going to show you, just -- just you.

14        MS. COLLINS:  Judge, I'm working on a new exhibit.

15        THE COURT:  Yes, okay.

16        MS. COLLINS:  This is Government's Exhibit 20-C, and

17   this is "PARIC Waterway Memberships."

18   Q    (By Ms. Collins)  Ms. Judd, is this also a document that

19   you recall retrieving from the Defendant's desk, Government's

20   Exhibit 20-C?

21   A    Yeah.  Is that an 8-1/2 x 14 or 11 x 17?  Yes, that is.

22   Q    This is the document?

23   A    Yes.

24        MS. COLLINS:  Your Honor, I move for the admission of

25   Government's Exhibit 20-C.

1              THE COURT:  Received.

2     Q    (By Ms. Collins)  And we're not going to talk about this

3     document with you, but this is a document that you did find on

4     his desk that -- that you handed over to authorities, correct?

5     A    Yes.

6     Q    Okay.

7              MS. COLLINS:  New exhibit.

8     Q    (By Ms. Collins)  This is Government's Exhibit 20-D as in

9     "dog."  It's an expense report from November 26th, 2013, with

10    supporting material.  Do you recall this expense report?

11    A    I do.

12    Q    And then there were also documents that -- incentive

13    documents that were in his office that bear that same

14    signature, correct?

15    A    Yes.

16             MS. COLLINS:  Your Honor, I move for the admission of

17    Government's Exhibit 20-D as in "dog."

18             THE COURT:  Received.

19    Q    (By Ms. Collins)  Did you also find an expense report

20    with the date of November 26th, 2013, that seemed curious?

21    A    Yes.

22    Q    And what was curious about it?

23    A    It was the signature of our President, Keith Wolkoff,

24    that had also been taped, similar to the one that was taped

25    with Joe McKee's signature on it.

1    Q    So the document that's in my hands that's marked

2    Government's Exhibit 20-D also has the Scotch tape on it of

3    your President's signature.

4    A    Correct.

5    Q    Did you also find documents nearby that appear to have

6    that exact same signature that you thought were an overlay?

7    A    Yes.

8    Q    That's still part of Government's Exhibit 20-D, and we'll

9    talk about these incentives in just a second, but I'm showing

10   you for an example "2013 Incentive Spreadsheet."  Did you

11   believe that that signature was the same as the taped

12   signature?

13   A    Yes.

14   Q    And you found different versions of that incentive

15   spreadsheet?

16   A    Yes.

17   Q    What, if anything, did you notice about that signature in

18   comparison to the one that you found that had been taped on?

19   A    That it -- it just looks exactly the same.

20   Q    This is another version or page of the 2013 Incentive

21   Spreadsheet.  And again, ---

22        THE COURT:  All from Exhibit 20-D?

23        MS. COLLINS:  20-D as in "dog" is what we're on.

24        THE COURT:  Yes.

25        MS. COLLINS:  Yes.

1    Q    (By Ms. Collins)  What, if anything, did you notice about

2    that signature compared to the one that had the Scotch tape on

3    it?

4    A    It just -- All of these looked the same to me; the same

5    scale, the same loops in the letters.

6    Q    It was curious to you.

7    A    Yeah.  I mean I have a similar signature every time I

8    sign, but I can usually see some kind of variation either on

9    the size or the angle or something.

10   Q    Let's talk for a second about incentives while we're

11   looking at this folder.  Are incentives the same thing as what

12   some folks may call a "bonus" at the end of the year?

13   A    Yes.

14   Q    And how is that determined?  I know it's a large

15   calculation, complicated calculation that's done, correct?

16   A    Yeah.

17   Q    Who came up with that calculation of how bonuses would be

18   determined?

19   A    I believe that several years ago Brian Paluch proposed

20   the incentive plan to our leadership team, and it probably

21   went through some changes and arrived at what the plan is

22   today.

23   Q    So explain to me kind of the 30-foot explanation of how

24   an employee at PARIC's bonus is determined.

25   A    There's a piece of the calculation that has to do with

1    the margin revenue that the company makes over the course of

2    the year.  There's a component of it that has to do with each

3    employee's individual performance.  And then the third

4    component is each position within the company has an

5    eligibility of a certain percentage of their base for their

6    bonus.  So an engineer may be able to receive 10 percent of

7    his or her base compensation with a bonus or an incentive.  A

8    senior manager may have 30 percent eligibility.

9    Q    And as part of that calculation, is there like a rank or

10   a score that's also calculated?

11   A    That -- Each -- Each employee is given an end-of-the-year

12   performance review score.  It's a five-point scale.  And

13   depending upon where your overall performance falls, if you

14   fall at a 3, which is "Meets Expectations," you're eligible

15   for a hundred percent of -- in my example 10 percent if you're

16   an engineer or 30 percent if you're a senior manager.  If your

17   score -- If you performed really well and your score was

18   higher than, say, a 3, 3-1/2, you could receive an additional

19   amount above your base incentive level.

20   Q    How were the employees notified that they would receive

21   an end-of-the-year bonus and how much it was going to be?

22   A    We will hand out -- Well, a couple of ways.  There's the

23   verbal communication when they sit down and have their

24   communication with their supervisor.  The formal piece of that

25   process is they receive a check for their incentive amount

```
 1   with a letter that's written that explains what they were

 2   eligible for, what their performance review score was, and how

 3   that translated into their final incentive payment as well as

 4   what their base compensation is.

 5   Q    And during that process, does an individual at PARIC come

 6   up with a preliminary spreadsheet that has everyone's name on

 7   it, their score-rank and how much their incentive for the year

 8   is calculated to be?

 9   A    Yes.  That's generated as a result of our talent review

10   process where everybody is ranked and performance review

11   scores are calculated.

12   Q    Who creates that spreadsheet or who created that

13   spreadsheet?

14   A    I don't -- I think it's different over the course of the

15   couple of years that I've been back.  I think the final

16   spreadsheet was maintained by Brian.  The initial spreadsheet

17   may have been created by Accounting or HR to get the process

18   started.

19   Q    So the final spreadsheet, let's talk about that.  The

20   final spreadsheet that you said was maintained by -- or was

21   maintained by Mr. Paluch, what would he do with it?  Was there

22   an executive board meeting in which he would present it?

23   A    Yeah.  I think part of what he did with it was pull it

24   all together to present to the executive team to review, look

25   to see if there are any outliers or people that were scored
```

```
 1   too low or too high.  It was kind of a final check before the

 2   incentives were issued.

 3   Q    Okay.  I'm showing you what's already in -- been

 4   admitted, still part of Government's Exhibit 20-D as in "dog."

 5   This was the same exhibit that we had showed with that curious

 6   signature on the side, but would this be an example of -- of a

 7   copy of a spreadsheet that the executive team would see?

 8   A    Yeah.  I think those comments were comments that came up

 9   during -- during that review or that check of the spreadsheet

10   that Brian brought to the meeting.

11   Q    And are you on the executive team?

12   A    I am.

13   Q    So you're one of the members that would be at the meeting

14   reviewing the 2013 incentive sheets?

15   A    I -- I wouldn't have been in 2013.

16   Q    Okay.  Which year would you have been present?

17   A    2014.

18   Q    Okay.  So during the 2013 incentive year, would

19   Mr. Paluch hand you a stack of documents that supported

20   everyone's incentive pay for that year?

21   A    When you say a "stack of documents," I'm not sure what

22   you're asking.  I'm sorry.

23   Q    Sure.  Would he hand you incentive performance worksheets

24   for you to keep that would explain everyone in PARIC's

25   incentive amounts?
```

1    A    Yeah.  That's the formal communication that I explained

2    would go in with each employee's check.  And so I asked for

3    copies of those so that if any employees had questions about

4    their calculations, I would be able to help explain how it was

5    processed and ---

6    Q    Because if an employee had a question about their bonus,

7    they would come to you as the Director of Human Resources.

8    A    Or they would go to their supervisor and their supervisor

9    would come to me.

10    Q    And you wanted a backup of how exactly -- what exactly

11    the numbers were for each individual, correct?

12    A    Yes.

13    Q    So who did you ask to give you that supporting

14    documentation?

15    A    Brian.

16    Q    And did he, in fact, give it to you?

17    A    He did.

18    Q    How did he give it to you?

19    A    In 2013 I asked him -- We were -- It was before our

20    holiday party, and I asked him if he had those.  And he told

21    me to go stand at the copier, which I did because we didn't

22    want the sensitive information to just spit out.  So he

23    printed them, and I stood at the copier down the hall and took

24    the documents off the computer or off the printer.  I'm sorry.

25              MS. COLLINS:  Your Honor, may I just quickly show her

1    Government's Exhibit 23?

2           THE COURT:  Yes.

3    Q    (By Ms. Collins)  Are these the incentive worksheets that

4    you provided?

5    A    Yes.

6           MS. COLLINS:  Your Honor, I move for the admission of

7    Government's Exhibit 23 which are the 2013 performance

8    incentive worksheets.

9           THE COURT:  Okay, received.

10   Q    (By Ms. Collins)  Okay.  We've got a lot of paper going

11   on, but as part of Government's Exhibit 20-D as in "dog," I

12   showed you a spreadsheet or several spreadsheets that you

13   found on Mr. Paluch's desk, correct?

14   A    Yes.

15   Q    And on one of those spreadsheets on Row 8 or -- sorry --

16   Row 6 we see Mr. Paluch's name, correct?

17   A    Correct.

18   Q    What is his salary that's listed?

19   A    $188,100.

20   Q    Okay.  And these are from the spreadsheets that I showed

21   you that have questions and comments --

22   A    Correct.

23   Q    -- and some signatures.  Now the salary that's listed on

24   what's called the "Final Spreadsheet" that has questions and

25   comments and signatures on it, would you expect for someone's

1    bonus to be paid off at that amount of that current salary?

2    A    Yes.

3    Q    Specifically, you would expect for Mr. Paluch's 2013

4    bonus payment to be paid out at -- based off the calculations

5    but concerning the $188,000 as a salary, correct?

6    A    Yep; yes.

7    Q    Now switching to Government's Exhibit 23 which is the

8    2013 incentive worksheets, included in that, was that a

9    worksheet that Mr. Paluch created for himself?

10   A    Yeah.  Brian created all those worksheets.

11   Q    Now here, what does it list as the base pay upon which

12   the incentive is to be calculated?

13   A    $197,100.

14   Q    Not the same as 188.

15   A    No.

16   Q    Now going back to looking through documents that you

17   found on his desk, ---

18            MS. COLLINS:  Your Honor, this is a new exhibit.

19   This is Government's Exhibit 20-E as in "egg," and it's the

20   Sunset Country Club checks.

21   Q    (By Ms. Collins)  Ms. Judd, did you also find on his desk

22   a check for $15,673.50 paid to the order of Sunset Country

23   Club?

24   A    I'm not sure if I found it.  I don't know that I found

25   that check on his desk.

1    Q    Okay.  Let me see if I can show you these invoices; see

2    if that refreshes your memory.

3    A    I found the -- I found an invoice on his desk, yeah, but

4    I don't recall seeing the check on his desk.

5    Q    Do you recall any of these invoices?

6    A    There were -- There were several invoices that I found on

7    his desk, and then I started to pull invoices and copies of

8    checks that had been issued.  So it's hard to -- it's hard for

9    me to tell exactly which ones were on his desk.  I know ---

10   Q    Okay.  Let me ask you this:  During your internal

11   investigation, did you find other invoices other than ones

12   that were on his desk that you thought were curious that you

13   wanted to look into?

14   A    From Sunset Country Club?

15   Q    From Sunset Country Club.

16   A    Yes.

17   Q    Okay.  Do you recall this invoice, whether it came from

18   his desk or another location, as one that you wanted to look

19   into?

20   A    Yeah.  That one I do recall seeing on his desk.

21   Q    The one for 252 Nike PARIC Polo shirts?

22   A    Yes.

23   Q    Okay.  And then you pulled this check?

24   A    I -- I -- What I did is I went through the process of

25   trying to find backup documentation for the invoices that I

33

```
 1   found.  So I would have looked for that invoice number as a

 2   check, as a copy of a backup check that was sent to Sunset.

 3   Q    And this is what you would have found.

 4   A    Yes.

 5   Q    Okay.  So that's these so we don't get them confused.

 6   What -- What do you remember about the invoice for 144 Nike

 7   PARIC jackets?

 8            THE COURT:  The jury is not seeing this.

 9            MS. COLLINS:  I know.

10            THE COURT:  Okay.

11   A    Is there anything else at the top of that?  I'm sorry.

12   No.  The quantity was strange.

13   Q    (By Ms. Collins)  Is this one that you would have found

14   on his desk?

15   A    On his desk or in his computer.

16   Q    I'm just looking for ones that you can tell me that you

17   found on his desk.

18   A    That one I remember finding on his desk because I

19   remember the notation of the "7.575," I think.

20   Q    Okay.

21            MS. COLLINS:  Okay, Your Honor.  This is Government's

22   Exhibit 20-K as in "kite."  It's Invoice No. 9455 from Sunset

23   Hills found on Mr. Paluch's desk.  I move for the admission of

24   this document.

25            THE COURT:  Are you offering it?
```

```
 1              MS. COLLINS:  I move for the admission of this
 2   document.
 3              THE COURT:  Yes, received.
 4   Q    (By Ms. Collins)  Okay, Ms. Judd.  This is one that you
 5   definitely recall getting from his desk.
 6   A    Yes.
 7   Q    Okay.  Now why do you remember, specifically remember
 8   Invoice No. 9455 as one that you got from his desk?
 9   A    Because it looked like he calculated for the invoice --
10   Somebody was calculating the tax amount to be paid, and I
11   thought that was strange.
12   Q    So kind of where there's already a circle but -- where I
13   circled, that seemed strange and jogged your memory?
14   A    Yes.  That's -- Yeah.  That's why I remember that
15   specifically.
16   Q    Okay.
17              MS. COLLINS:  This is a new exhibit.  This is
18   Government's Exhibit 20-F, and it's Paluch's portfolio at
19   Meyer Financial Group.
20   Q    (By Ms. Collins)  Ms. Judd, do you remember seeing this
21   document?
22   A    Yes.
23   Q    And you put it in the box, --
24   A    Yes.
25   Q    -- Box 20?
```

1          MS. COLLINS:  Your Honor, I move for the admission of

2    Government's Exhibit 20-F which is Paluch's portfolio at Meyer

3    Financial Group.

4          MR. BAUMSTARK:  Judge, could we have a side bar on

5    this?

6          THE COURT:  Sure.

7          MS. COLLINS:  Sure.

8          (Bench conference on the record with counsel and the

9    Court:)

10         THE COURT:  Go ahead.

11         MR. BAUMSTARK:  Judge, this exhibit, it contains

12   account numbers for financial accounts which I think should be

13   redacted before this is presented to the jury.  To publicize

14   someone's account numbers and their financial accounts is

15   dangerous.

16         THE COURT:  These are account numbers of other

17   individuals?

18         MR. BAUMSTARK:  This is -- This is my client and his

19   family.

20         THE COURT:  Oh, I see.  Oh, I see.

21         MR. BAUMSTARK:  Yes.

22         THE COURT:  Okay.  So if just the numbers are

23   redacted, does that satisfy your objection?

24         MR. BAUMSTARK:  Well, ---

25         THE COURT:  Here's what I'm thinking.  It's close to

1    noon.  We'll just go ahead and take the lunch recess now and

2    that can be done.  And then we can come back and present it to

3    the jury.

4          MR. BAUMSTARK:  Yeah.  Ms. Judd has identified it.

5    That's fine.  I just -- I'd prefer that my client's financial

6    information not be publicized.

7          MS. COLLINS:  Sure.  I'll redact the account number,

8    but the document comes in.

9          THE COURT:  Okay.  That will satisfy your objection?

10          MR. BAUMSTARK:  Yeah.

11          THE COURT:  Okay.  All right.  Thank you.

12       (End of discussion at side bar.)

13          THE COURT:  We're going to take -- We're going to --

14    I think I have been ceremoniously unconnected.  Hello?  Hello?

15          (Technical difficulties were handled concerning the

16    courtroom microphones.)

17          THE COURT:  We're going to take the lunch break a

18    little early.  It will be one hour, and come back, please, at

19    12:50, one hour from now.

20          Until the case is given to you to decide, you must

21    not discuss it among yourselves or with others or remain in

22    the presence of anyone talking about it.  If anyone tries to

23    talk to you about the case, advise me immediately.  Do not

24    read, watch or listen to any radio, television or news reports

25    of the trial, and keep an open mind until all of the evidence

1   has been received and you've heard the views of your fellow

2   jurors.

3            Court's in recess for one hour.

4            (Jury excused from the courtroom for the lunch hour.)

5            THE COURT:  You may step down.

6            (Court recessed from 11:50 AM until 12:50 PM.)

7            THE COURT:  There's a big thing going on in the court

8   on Monday.  The Magistrate Selection Committee is meeting;

9   judges are meeting, and there's a filming thing going on like

10   at 10:30 in the morning that I need to be a part of.  And so

11   we're going to -- we're not having court on Monday.  For an

12   hour and a half it would be a waste of everyone's time to be

13   here.

14            MR. BAUMSTARK:  So we're -- we're just going to take

15   Monday off and come back on Tuesday.  Is that the idea?

16            THE COURT:  Yes.

17            MR. BAUMSTARK:  Okay.

18            THE CLERK:  We're waiting on five.

19            THE COURT:  Waiting on five?  Okay.

20            MR. WARE:  Either that or hurry up and get it done by

21   Friday.

22            THE COURT:  Well, ---

23            (Pause)

24            (Jury seated by the Clerk.)

25            THE COURT:  Please be seated.  You may continue.

```
 1                MS. COLLINS:  She's right on her way.

 2                THE COURT:  Okay.

 3                (Pause)

 4                THE COURT:  You're still under oath.

 5                CONTINUED DIRECT EXAMINATION OF CHRISTIE JUDD

 6    QUESTIONS BY MS. COLLINS:

 7                MS. COLLINS:  Your Honor, this is a new exhibit.

 8    This is Government's Exhibit 20-F which we were talking about

 9    right before the break.

10                THE COURT:  Yes.

11                MS. COLLINS:  And it's Paluch's portfolio with Meyer

12    Financial Group.

13                THE COURT:  Yes, received.

14                MS. COLLINS:  Okay.

15    Q    (By Ms. Collins)  Ms. Judd, do you remember finding this

16    document also on Brian Paluch's desk?

17    A    I do.

18    Q    Okay.  And other than the redaction portion that's in the

19    account and the carrier which I did over the lunch break, is

20    this the document that you recall?

21    A    Yes.

22    Q    Okay.  What was curious with that to you?

23    A    That the name, Meyer Financial.  Bob Meyer is our health

24    insurance broker.  And when I looked at that, I thought

25    immediately that something that appeared to have a statement
```

 1  and value in different accounts would have been a conflict of

 2  interest.

 3  Q    So let's talk about the Meyer Group.  Who was Bob Meyer?

 4  A    Bob Meyer is our -- was our health insurance broker.

 5  Q    And PARIC is self-insured, right?

 6  A    Correct.

 7  Q    So with Bob Meyer being the broker, what does he do or

 8  did he do?

 9  A    He would put our -- our account for renewal to different

10  carriers to see where it made sense to place our business.  He

11  advised on plan design.  He advised on ancillary services that

12  our employees could possibly benefit from.  So they're kind of

13  an intermediary between the company and the actual insurance

14  carrier like a Blue Cross or ---

15  Q    Now with the broker, does the broker make suggestions of,

16  other than the -- just the carrier, of other subcompanies to

17  use?  Maybe those that actually process claims?

18  A    Yes.

19  Q    So during your -- during your internal investigation, did

20  you determine anything that you thought was of interest

21  regarding Bob Meyer and the different companies that he owns?

22           MR. BAUMSTARK:  Your Honor, I would object to the

23  relevance.

24           THE COURT:  Okay.  I'm not sure.  Let's hear it

25  first.  Overruled.

```
 1              THE WITNESS:  Should I answer?

 2              THE COURT:  You may answer.

 3              THE WITNESS:  Okay, thanks.

 4    A    I -- I did not -- Prior to Brian leaving, I was not

 5    involved in the administration of the plan.  And so after he

 6    left, I started looking for plan documents and agreements and

 7    contracts to try to understand how our health insurance policy

 8    was being administered.  And what I found was that we didn't

 9    have -- couldn't locate a signed current year contract, and

10    that one of the groups that was contracted to help administer

11    the plan and process benefits and reimburse carriers was also

12    one of Bob Meyer's companies.

13    Q    So essentially Bob Meyer, as the broker, is suggesting or

14    suggested to PARIC that his own company be used as one of the

15    companies to process the claims.

16    A    It gets kind of confusing, but there are, I guess,

17    subsidiaries of the Meyer Group or different companies with

18    different names; that I thought it was strange that they were

19    also participating in the administration of our benefits.

20    Q    So there was more than just one subsidiary that you

21    found.

22    A    Yes.

23    Q    Were there several?

24    A    Yes.

25    Q    There were several subsidiaries?
```

1   A    I don't know if they're actually considered subsidiaries

2   or different organizations but that Bob was identified as the

3   primary owner of several other companies.

4   Q    Okay.  So regardless of if they're called "subsidiaries"

5   or "subgroups," there were several companies that were

6   associated with your broker, Bob Meyer, that were used in the

7   process of ---

8   A    There were at least a couple, --

9   Q    Okay.

10  A    -- but there were other companies that we learned under

11  his ownership.  Whether they had other things to do with PARIC

12  or not, I know that there were a couple.  I don't know how

13  many passed that.

14  Q    Now what exactly -- You said the broker helps you guys

15  find the best deal?  Is that what you said?

16  A    It's -- Again, it gets complicated when you're partially

17  self-insured versus being completely, you know, fully insured

18  by a carrier, but because health insurance and navigating the

19  -- especially with the Affordable Care Act, they act as a

20  liaison for the company to help recommend plan design,

21  options, what your copay amount should be.  So everything

22  relating to how we manage our plan and how we outsource

23  third-party groups tied to that plan administration.

24  Q    Was Bob Meyer the broker for your healthcare -- Do you

25  know when that relationship began?

1    A    I want to say that began maybe 2010, roughly.  I don't --

2    It's several years, but it goes back a little ways.

3    Q    Now you said that he was your former broker.  When did

4    that relationship end?

5    A    That relationship ended around June of last year, 2014.

6    Q    And when he no longer was your broker, do you have a new

7    broker now?

8    A    We do.

9    Q    Has PARIC's expenses regarding payments, being

10   self-insured, have they gone up or have they gone down?

11   A    Well, they've -- they've gone down.  They've -- They

12   started to drop prior to even changing brokers immediately

13   after Brian left.  So I began asking a lot of questions.  Our

14   team began asking a lot of questions about how things were

15   processed and who were employees that were appearing on

16   reports and through our pharmacy benefits and, you know,

17   perhaps coincidentally, I'm not sure, but our claims

18   experience would decrease after those -- after February.

19   Q    So after Mr. Paluch is no longer with PARIC, you're

20   involved and you're asking questions, correct?

21   A    Yes.

22   Q    And you're determining these different subgroups or

23   subsidiaries, whatever you want to call them, of the Meyer

24   Group, correct?

25   A    Correct.

1    Q     And then it's at that point that you're involved and

2    you're asking questions that you're noticing that PARIC's

3    costs are going down.

4    A     So our -- our -- There are some consistent costs under

5    the same month to month, but the variable costs that can

6    change based on just activity that all our participants would

7    have and what we would be billed for from the different

8    physicians and physician organizations dropped, yeah.  So some

9    costs remained the same.

10   Q     Did it drop significantly?

11   A     It did.

12   Q     Now there's also -- PARIC has a medical accrual account?

13   Is that correct?

14   A     Yes.

15   Q     Okay.  And what is that account?

16   A     From what I understand, it's an account that our -- We

17   try to anticipate what our total usage will be on an annual

18   basis as it relates to reimbursements and fees associated with

19   managing and insuring our plan.  So we try to project what our

20   annual costs will be, and we accrue towards that number.

21   Q     Now during the time that Mr. Paluch was an employee of

22   PARIC, who was in charge or had control of this medical

23   accrual account?

24   A     Well, Brian would have control of all of the accounts as

25   the CFO, and that was an account that I'm assuming he also

1    oversaw.  I didn't have access to that information at the

2    time.

3    Q    Okay.  During your review of all the medical-related

4    items that PARIC pays out and debits, did you take a look at

5    the medical accrual account?

6    A    I did.

7    Q    Did you find anything there that you thought was curious?

8    A    I did.

9    Q    What did you find?

10   A    There was an amount that was adjusted from that

11   accrual -- the medical accrual account that tied to a purchase

12   that Brian Paluch had made for a shower door.

13   Q    Okay.  The shower door, was that a shower door for

14   Mr. Paluch's house?

15   A    It -- What I found first was a receipt from -- I think it

16   was Lakeside.  It was -- I forget the vendor, who it was, but

17   then the receipt showed that it was a shower door delivered

18   and installed to his home address.  And so I wasn't sure what

19   that was.  And so I started looking for the offset to see if

20   it had been taken out of either payroll deduction.  Sometimes

21   that will happen.  If we make purchases, we'll have a payroll

22   deduction taken out or offset somewhere else.  And so I

23   started looking through the accounts and saw that there was a

24   notation made by Lisa Chapman, another employee of ours, that

25   said that the expense should be taken out of Employee

1   Receivable which means it would have been a payroll deduction.

2   And then there was another adjustment for that same amount

3   that was with the medical accrual.

4   Q    Do you remember the amount?

5   A    $1285.10.

6   Q    Would a shower door for Mr. Paluch's home, would that be

7   a PARIC-related expense?

8   A    I don't know how.  What I thought possibly is that

9   because we use various subcontractors and that a shower door

10  could possibly have come from a contractor, that perhaps we

11  purchased it and then he just reimbursed it, but I didn't find

12  that that was the case.

13  Q    Did you take a look at all of Mr. Paluch's paystubs?

14  A    I did.

15  Q    To see if, in fact, he had paid that back?

16  A    I did.

17       MS. COLLINS:  Your Honor, I'm going to now switch to

18  Government's Exhibit 17.  This has already -- This has already

19  been admitted.

20       THE COURT:  All right.

21  Q    (By Ms. Collins)  So looking at Government's Exhibit 17,

22  they are all of Mr. Paluch's paystubs.  When we go to the last

23  paystub for each year, it shows us not only, for an example,

24  the gross pay for that year but it shows us the year to date,

25  correct?

1    A    Yes.

2    Q    Okay.  And there was some testimony earlier about if

3    there's a payback, that it would be in Employee Receivables.

4    Do you believe that that's where it would show under the

5    paycheck?

6    A    Yes.

7    Q    Okay.  So for year end, and this the year of 2012 -- I'm

8    sorry -- 2010, how much for the whole year did Mr. Paluch

9    deduct from his paycheck as Employee Receivables?

10    A    $855.19.

11    Q    I think that might be a "6."  Re-read it.

12    A    I don't have my glasses.  I'm sorry.  $655.19.

13    Q    Okay.  For 2011 year end, this is the 2011 period, for

14    that entire year, were there any Employee Receivables?

15    A    Not classified properly under Employee Receivables.

16    Q    Okay.  2012, do we see any Employee Receivables there?

17    A    No.

18    Q    2013, we do see some Employee Receivables, and what's

19    that amount?

20    A    $530.

21    Q    For the entire year of 2013.  And I do have 2014, so I'll

22    just show it to be complete.  Mr. Paluch's service was

23    terminated in February, so this is the last paystub, but are

24    there any Employee Receivables there?

25    A    No.

```
 1   Q    Okay.  So you looked for the shower door payment and what

 2   did you find?

 3   A    I didn't find that $1285.10 had been reimbursed through

 4   the Employee Receivable account.

 5   Q    Okay.  Do you remember, Ms. Judd, an incident, an event

 6   where one of your employees by the name of Craig Shutler --

 7   A    Schlueter.

 8   Q    -- Schlueter retired?

 9   A    Craig Schlueter has not retired.

10   Q    Okay.  Do you remember an incident in which the company

11   was going to give him a gift card for some reason?

12   A    Not Craig Schlueter.

13   Q    Who do you recall that the company was going to give a

14   gift card to this individual and decided instead to make it a

15   part of his paycheck?

16   A    We had a situation where we had a long-term

17   superintendent who was retiring, but his name is not Craig.

18   It's Dave Parisoto.

19   Q    Do you remember conversations regarding what PARIC was

20   going to give him as his retirement gift?

21   A    Well, I think we were at a leadership meeting, and we

22   were talking about what we were going to do for his retirement

23   because it was coming up, and Brian suggested that we give him

24   cash.  We talked about a variety of different gifts and all

25   felt that it would be appropriate to give him money because he
```

1   was building a house down at the lake and that he could use

2   that to help build the house.  And Brian suggested that we

3   use -- we just got him a gift card, and I thought it would

4   probably be better to run that through payroll so that for

5   that large of an amount, that taxes could be withheld.

6   Q    What was the amount?

7   A    We were going to gross up the amount of the check so that

8   he would net $5000.  So we wanted to give him a $5000

9   retirement gift.  So I don't know what the exact amount of the

10  actual gross was, but it was to net approximately $5000.

11  Q    Was the gift cards purchased for his retirement?

12  A    It appeared afterwards -- I didn't know that they were

13  purchased because a check was issued to Dave, but there had

14  also been checks purchased or -- excuse me -- gift cards

15  purchased for $5000 around that same date.

16  Q    So the employee that was retiring, he received his $5000

17  through his payroll.

18  A    Yes.

19  Q    Okay.

20       MS. COLLINS:  Your Honor, may I approach the witness?

21       THE COURT:  Yes.

22  Q    (By Ms. Collins)  Ms. Judd, I'm going to hand you what's

23  marked as Government's Exhibit 26.  Do you recall providing

24  this to the Government upon request?

25  A    I do.

1    Q    Okay.  And what is it?

2    A    This is our Medical Accrual General Ledger, Detailed

3    Transaction Summary.

4    Q    Okay.  I'll take it back.

5    A    Okay.

6         MS. COLLINS:  Your Honor, I move for the admission of

7    Government Exhibit 26 which is PARIC's Medical Accrual General

8    Ledger.

9         THE COURT:  Received.

10   Q    (By Ms. Collins)  When you were determining whether or

11   not that shower door actually came out of the medical accrual

12   account, would this have been the document that you would have

13   reviewed to see that it did, indeed, come out?

14   A    It is.  I'm -- Since I'm not -- I'm not an accountant, I

15   asked our Director of Accounting and our Director of IT who

16   also has done a lot of work in Accounting to help me

17   understand what I was reading, and so they walked me through

18   this.

19   Q    Okay.  And walking through this document, did you

20   determine that the $12,000 or $1200 for the shower door, in

21   fact, came out of the medical accrual account?

22   A    Yeah.

23        MR. BAUMSTARK:  Your Honor, I'm going to object to

24   that.  This is -- This is calling for hearsay.  She indicated

25   she doesn't know how to read this, that she went to other

50

1    people, and now they're trying to get the testimony out of

2    her.

3           THE COURT:  All right.  I'll allow it to the extent

4    if you can develop as to what she did as opposed to -- If this

5    is something that was prepared by someone else, I would

6    sustain the objection, but it appeared that she did something

7    in the preparation.  Could you develop that a little bit

8    further, Ms. Collins?

9           MS. COLLINS:  Sure.

10   Q    (By Ms. Collins)  This document, Ms. Judd, is this an

11   account summary that's found in PARIC's computer system?

12   A    Yes.

13   Q    Okay.  And so in looking at it, you pulled it off and you

14   reviewed it, correct?

15   A    I requested that it be printed and brought to me, and it

16   was brought to me, and I went through it, and I could pretty

17   clearly tell that the money had been taken from one account to

18   another, and it never -- it never came back out of the medical

19   accrual and offset under the Employee Receivable.  But because

20   I'm not an accountant, I wanted to make sure that I was

21   reading the information correctly, so I asked the accountant

22   to validate if what I was assuming was actually the case.

23   And ---

24   Q    And was it?

25   A    And they said "yes."

1          MR. BAUMSTARK:  Objection, Your Honor.  That's --

2    That's hearsay.

3          THE COURT:  Well, as to what they said, I would have

4    to sustain the objection.  But this -- this is an official

5    record of the company.  Is that correct?

6          MS. COLLINS:  That's correct, Your Honor.

7          THE COURT:  Okay.  So overruled.

8    Q    (By Ms. Collins)  Before I let you go, Ms. Judd, there

9    was a couple more items that you noted that seemed curious

10   that you put into Government's Exhibit 20 that I want to ask

11   you about.

12         MS. COLLINS:  This would be a new document,

13   Your Honor, --

14         THE COURT:  All right.

15         MS. COLLINS:  -- Government's Exhibit 20-H.  It's an

16   Omaha Steak Account Summary or Order Summary.

17   Q    (By Ms. Collins)  Do you recall pulling this from

18   Mr. Paric's (sic) desk and putting it into a box that you

19   later gave to federal authorities?

20   A    Can you scroll down to the top so I can see the top

21   again, please?  Yes.

22   Q    Okay.

23         MS. COLLINS:  Your Honor, I ask that Government's

24   Exhibit 20-H as in "Harry" is admitted.

25         THE COURT:  Could you, again, tell me how you

1    identified it?

2              MS. COLLINS:  Omaha Steak.

3              THE COURT:  Okay, Omaha Steak.  I got it.  Okay.  I

4    saw "Steaks."  Okay, I got it.  Received.

5    Q    (By Ms. Collins)  Now, Ms. Judd, you said you pulled --

6    you pulled this and put it in the box and then later reviewed

7    it as something that might be curious.  What was of interest

8    on this?

9    A    Well, what was of interest is that from the process that

10   I understood, our Executive Assistant ordered the Omaha Steaks

11   at Christmas for our clients.  So it was a client gift.

12   Q    And who had placed those orders?

13   A    Marjorie White who is Joe McKee's Executive Assistant.

14   Q    So it was curious to you as to why that Order Summary

15   would be on Mr. Paluch's desk if Marjorie White normally

16   handles those orders?

17   A    That's what I -- Yeah.  It just ---

18   Q    Okay.  A couple of other things that you pulled.

19              MS. COLLINS:  This would be Government's Exhibit

20   20-I, and this is the American Express Membership Rewards.

21   Q    (By Ms. Collins)  Do you recall pulling this, Ms. Judd?

22   A    I do.

23   Q    Okay.

24              MS. COLLINS:  Your Honor, I ask that 20-I be

25   admitted.

1              THE COURT:  Just a second.

2              (Pause)

3              THE COURT:  Received.

4    Q    (By Ms. Collins)  Ms. Judd, what was curious about -- or

5    to you about Government's Exhibit 20-I?

6    A    That purchase for the points used under the Marriott and

7    that Brian Paluch was the owner of the American Express

8    account for the company.  It was -- It was inconsistent with

9    my understanding of how the card was to be used; that the

10   company was to share in the point distribution.  So as

11   purchases were made by the executives, they were to share in

12   the benefit of the points that would accrue on the credit

13   card, and I don't know that anybody else utilized those

14   points.

15   Q    Okay.  So here there's a total point balance of about 52

16   -- 152,000.  So that just seemed somewhat -- something curious

17   that you tagged?

18   A    Yes.

19             THE COURT:  On 20-H, I think it was believed after it

20   was received that the jury saw that, but I realized the switch

21   was down.  So if you wanted to show the jury 20-H, you need to

22   do it again.  It was my fault.  I didn't have the switch in

23   the right position.

24             MS. COLLINS:  Okay.

25   Q    (By Ms. Collins)  20-H was the Omaha Steak Order Summary,

1    and you said what was curious about this was that normally

2    it's Joe McKee's assistant that handles the Omaha Steak

3    orders, correct?

4    A    Yes.

5         MS. COLLINS:  Your Honor, this is a new exhibit.

6    This is 20-J as in "Jack."

7    Q    (By Ms. Collins)  Do you recall finding an American

8    Express credit card that you tagged?

9    A    Yes.

10   Q    Okay.

11        MS. COLLINS:  Your Honor, I ask for the admittance of

12   Government's Exhibit 20-J which is an actual credit card,

13   American Express credit card ending in 2018.

14        THE COURT:  All right.  Received.

15   Q    (By Ms. Collins)  What was curious about this, Ms. Judd?

16   A    Well, at the time I found it in the top drawer of his

17   desk, and I don't remember all the exact account numbers, but

18   I think what I remember about this one is that it was

19   different than the account number that was on the American

20   Express current statement that I was looking at.  So I was

21   confused as to why there were different American Express card

22   numbers with his name on it.

23   Q    Okay.

24        MS. COLLINS:  Your Honor, this is not an exhibit that

25   I'm showing next.

55

1   Q    (By Ms. Collins)  During your review of some of the

2   incentive payouts and incentive spreadsheets, did you

3   determine or come to question a signature of yours that was on

4   one of the incentive spreadsheets?

5   A    I did.

6   Q    Okay.

7           THE COURT:  Is this new?  Not received?

8           MS. COLLINS:  I'm just going to ask her about it.

9           THE COURT:  Okay.

10  Q    (By Ms. Collins)  This is an incentive sheet from also

11  2013.  Do you see what appears to be your signature on there?

12  A    Yes.

13  Q    Do you believe that that's your signature?

14  A    I believe that is my signature but that I didn't put it

15  on that document.

16  Q    Why do you say that?

17  A    Because I don't sign anything down to the right.  I'm

18  right-handed, and the way I hold my paper, I would have either

19  signed it straight or I would have signed it up to the right,

20  my signature pointed up to the right or straight.  That for me

21  to take a sheet of paper and sign down to the right as a

22  right-handed person, that just would feel very awkward.

23          THE COURT:  Did that one have a number?

24          MS. COLLINS:  I didn't move to admit it.

25          THE COURT:  All right.

```
 1   Q    (By Ms. Collins)  Ms. Judd, did you -- Through your

 2   review after Mr. Paluch was terminated, did you determine that

 3   there was a situation in which PARIC paid for Mr. Paluch's

 4   niece to be employed with McCarthy Leonard's law firm?

 5   A    A partial -- In part.  I don't know how much of it, but

 6   yes.

 7   Q    Were you involved in collecting the bill that was sent to

 8   PARIC and the check that PARIC paid and handing it to

 9   investigators?

10   A    Yes.

11        MS. COLLINS:  Your Honor, may I approach?

12        THE COURT:  Yes.

13   A    Yes.

14   Q    (By Ms. Collins)  Is this a document that you provided to

15   federal investigators?

16   A    Yes.

17   Q    Okay.

18        MS. COLLINS:  Your Honor, I ask for the admittance of

19   Government's Exhibit 31 which is a PARIC bill to McCarthy

20   Leonard with an attached check.

21        THE COURT:  Received.

22        MS. COLLINS:  We'll talk about it later.

23   Q    (By Ms. Collins)  Did you also find on Mr. Paluch's desk

24   a sheet of PARIC board member signatures?

25   A    I did not find it.  The CFO who we now have who replaced
```

1    Brian produced a document that he found in the desk drawer.

2    Q    Okay.  Now you told us when we began that you reported to

3    Mr. Paluch from the time that you were employed with PARIC,

4    correct?

5    A    Yes.

6    Q    And there were times that -- Were you all friendly with

7    each other?

8    A    Yeah.

9    Q    Okay.  And there were times that you all talked or that

10   Mr. Paluch might talk to you after a board meeting.  Is that

11   correct?

12   A    Brian and I talked a lot.

13   Q    Okay.  Do you recall instances in which Mister --

14   Mr. Paluch believed that he should have been the President of

15   the company?

16   A    I -- My -- Yeah, I do recall those conversations.

17   Q    That he had with you?

18   A    Yes.

19   Q    And what did he say?

20   A    He said that based on his experience and his knowledge,

21   that Keith wasn't equipped to be in that position and that he

22   should have been named President at the time Joe transitioned

23   that role to Keith.  And he talked about how one of our

24   competitors had a similar transition and their CFO was named

25   President recently.  That was not recently as of today but the

1    time the conversation took place.

2    Q    Did he feel as if he had been looked over for that

3    position?

4    A    I don't know how he felt, but his comments made me feel

5    that he definitely felt like that he was entitled or should

6    have had that role.

7         MS. COLLINS:  I don't have any other questions.

8    Thank you, Ms. Judd.

9         THE COURT:  Cross Examination.

10        We'll be taking a recess about 2:30 unless someone

11   needs one before.

12                      CROSS EXAMINATION

13   QUESTIONS BY MR. BAUMSTARK:

14   Q    Good afternoon, Ms. Dotson (sic).

15   A    Ms. Judd.

16   Q    I apologize; Ms. Judd.

17   A    Pam was here earlier.

18   Q    You were subpoenaed by the Government in this case.  Is

19   that correct?

20   A    I was.

21   Q    Okay.  And what agents did you talk to?

22   A    Recently or ---

23   Q    Well, let's start with:  How many times have you spoken

24   to Government agents?

25   A    I don't know for sure.  I spoke with Matt Villicana.  I

```
 1   don't know specifically if they're all Government agents, but

 2   Monique, Matt, John and Dianna, but, again, I'm not sure if

 3   they're -- how they're all classified --

 4   Q    Okay.

 5   A    -- by title.

 6   Q    About how many times have you met with them in

 7   preparation for this case?

 8   A    Three times maybe.

 9   Q    Three times.  And have you ever spoken to them on the

10   phone beyond that?

11   A    In between those meetings.

12   Q    Okay.  About how many times did you do that?

13   A    Just a couple probably; not with all of them; with Matt.

14   Q    Okay.  So if I'm understanding you correctly, it sounds

15   like you've either met or talked to them maybe four to six

16   times?

17   A    That's probably accurate.

18   Q    Okay.  And what did you discuss with them?

19   A    They asked about all the things we've been talking about

20   this morning.  So they asked me very similar questions about

21   what documents we've discovered, where they were found; if not

22   by me, then by whom; and who should they talk to about that

23   document.  So it was -- felt to me very similar to what we're

24   doing right now.

25   Q    Okay.  And did those meetings occur in this building?
```

1    A    I met in this building after I was subpoenaed and then

2    the other two times it was in our office.

3    Q    Okay.  So after you were subpoenaed, would that have been

4    today?

5    A    No.  I was subpoenaed a week and a half, two weeks ago.

6    Q    Okay.  So is that the last time that you met with them?

7    A    Yes.

8    Q    Okay.  And how about a telephone conversation?  Was there

9    one of those in between the last meeting and today?

10   A    There were telephone calls to me to coordinate the times

11   that our witnesses were to show up for the trial, so one point

12   of contact for several of our employees who were showing up

13   today.  So it was logistics, where to go, what time to be

14   here.

15   Q    Okay.  Now Brian generally left his desk at PARIC open.

16   Is that correct?

17   A    "Open" meaning?

18   Q    Unlocked.

19   A    Unlocked.  It was unlocked when I went in there to clean

20   it out, but I never really tried to go in his desk before.

21   Q    Okay.  But it was unlocked when you went in there that

22   day.

23   A    That day.

24   Q    Okay.  And he had a cubicle.  Is that correct?

25   A    Yes.

1    Q    So you can't really lock up a cubicle, right?

2    A    There was no door to lock.

3    Q    Okay.  And Brian missed about two weeks of work right

4    before he got fired, didn't he?

5    A    It was in the winter.  I don't remember the exact date,

6    but he was out for a period of time.

7    Q    Okay.  And that was because he was having heart surgery,

8    correct?

9    A    He had a medical -- a medical event involving his heart.

10   I don't know what the actual procedure was.

11   Q    Okay.  And during that time that he was gone, anybody

12   could have had access to his desk.  Is that correct?

13   A    Sure.

14   Q    Okay.  And actually on the -- on the day Brian was fired,

15   you had a morning meeting with him.  Is that correct?

16   A    With Brian?

17   Q    Yes.

18   A    Likely.  We had a lot of morning meetings, but I don't

19   know specifically.

20   Q    And that would have been preparing for a financial

21   management institute audit?

22   A    Could have been.

23   Q    Okay.  So you don't recall whether you met with Brian

24   before he was terminated?

25   A    Brian and I, we met multiple times a day most every day.

```
 1    So on that particular morning, it would have been very likely
 2    that we spent time together.
 3    Q    But you just can't recall that.
 4    A    I can't.
 5    Q    Okay.  There's been a lot of talk about Government
 6    Exhibit 20 which is the contents of that box.  Is that
 7    correct?
 8    A    Yes.
 9    Q    And as I understand it, these -- these are items that you
10    assembled from Brian's desk.  Is that correct?
11    A    Yes.
12    Q    Okay.  When did you put them in the box?
13    A    The evening that he was terminated.
14    Q    Okay.  And when did you inventory what was in the box?
15    A    When did I inventory it?
16    Q    Yes.
17    A    What do you -- I'm not sure.
18    Q    When did you create an inventory of what was in the box?
19    A    The box was assembled that day and then went into our
20    locked storage closet until I needed it.  And then I had a
21    lock put on the conference room door so I could keep the
22    material I was looking at in there, so.
23    Q    Okay.  Now how long was it in that storage room closet
24    before you inventoried it?
25    A    A week or so maybe.
```

63

1   Q    Okay.  And what was the name of this closet?  Was this

2   the marketing closet?

3   A    The HR closet.

4   Q    The HR closet, okay.  And was the HR closet the one that

5   was typically kept open for air conditioning issues?

6   A    Every time I've gone to the HR closet it's been locked.

7   Q    Who had keys to that closet?

8   A    Nobody has keys.  It's a pass code entry.

9   Q    Who is -- Do you know who knows the pass code to that

10  closet?

11  A    Brian knew it.  I knew it.  Denise, our HR Manager;

12  Brian's assistant, Jordan; probably Pam Dotson, our IT

13  Director.  I don't -- There wasn't a list.  I just know that

14  those were people that were in -- had access to it.

15  Q    Okay.  So at the very least those people knew about it.

16  Who else knew about it, you're not quite sure.

17  A    No, I couldn't -- I couldn't tell you that.

18  Q    Okay.  And you said you didn't inventory it for at least

19  a week.  Is that right?

20  A    When you say "inventory," do you mean everything that I

21  put in there I kept a list of?

22  Q    Yes.  I mean you recorded what the contents of

23  Mr. Paluch's desk were.

24  A    No, I didn't do that before.  It was in my possession and

25  then in the closet and then in the storage or in the storage

1    room and then into the conference room.

2    Q    Did you ever inventory the contents --

3    A    No.

4    Q    -- of that box?

5    A    No.

6    Q    Okay.  So if you've never inventoried the contents of

7    that box, isn't it true that you can't say if anything was

8    ever added to that box?

9    A    I guess it's possible.

10   Q    Okay.  And you can't say whether anything was ever taken

11   away from that box.

12   A    Without an inventory list, no.

13   Q    Okay.  And at some point the box was given to the

14   Government.  Would that have been in May of 2014?

15   A    The box was not given to them in May of 2014.

16   Q    When was the box given to them?

17   A    A few weeks ago.

18   Q    Okay.  So the box has been in your custody for the past

19   approximately year and a half.

20   A    Yes.

21   Q    Okay.  And it's your testimony today that the Government

22   never took custody of it.

23   A    Until a few weeks ago.

24   Q    Okay.  One thing you talked about fairly early in your

25   testimony is your history at PARIC.  Is that correct?

1    A    Yes.

2    Q    And you indicated that you had a prior tenure at PARIC.

3    Is that correct?

4    A    Yes.

5    Q    And when did that end?

6    A    That ended in 2010.

7    Q    Okay.  And when did you -- when did you start back up

8    with PARIC?

9    A    In 2000 and -- Early 2013, I think.

10   Q    Okay.  So the period between 2010 to 2013 you were

11   elsewhere.  Is that correct?

12   A    Correct.

13   Q    Brian was your supervisor when you left, wasn't he?

14   A    Yes.

15   Q    Okay.  And you had an exit interview with Joe McKee when

16   you left, didn't you?

17   A    I did.

18   Q    And that was an upsetting experience for you, wasn't it?

19   A    Yes.

20   Q    And, in fact, you were in tears after Mr. McKee talked to

21   you about your leaving.

22   A    Yes.

23   Q    And isn't it true that you were in tears because

24   Mr. McKee was angry that you were leaving?

25   A    Yes.

66

1    Q    And isn't it true that when you were in tears from

2    Mr. McKee being angry with you about leaving, you went and

3    talked to Brian about it?

4    A    I probably did.

5    Q    Okay.  One thing that you testified about was

6    Dave Parisoto's retirement.  When did that happen?

7    A    Dave retired in December or January of -- I guess it

8    would have been 2013, the end of 2013.

9    Q    End of 2013, early 2014?

10   A    Yeah.

11   Q    In that range?

12   A    (Affirmative gesture).

13   Q    Okay.  And I believe you testified earlier today that --

14   that Brian suggested that Dave be paid in gift cards.  Is that

15   correct?

16   A    Initially it was, "Let's just get him a gift card for

17   $5000," or -- Yeah.

18   Q    Okay.  And it was your testimony that you were the one

19   who decided, "No, it would be better to cut him a check."

20   A    I didn't decide it.  We were talking about it in an

21   executive meeting, and I just said, "Maybe if we want to give

22   him $5000, let's just gross it up."

23   Q    Okay.

24   A    So that he can net the 5000 but that the taxes were taken

25   out of it.

1    Q    Okay.  And that that was your idea.  Is that your

2    testimony today?

3    A    Yeah.

4    Q    Okay.  Do you have a background in Accounting?

5    A    No.

6    Q    Okay.  Brian does, right?

7    A    He does.

8    Q    Okay.  Now did you -- Were you involved at all in the

9    investigation of -- of Brian's termination?

10        Well, I don't need to ask that.  We've been

11   testifying about it quite a bit.  You were, correct?

12   A    Yes.

13   Q    Okay.  And as part of that, did you investigate -- Well,

14   as part of that, you investigated some Enterprise Bank and

15   Trust gift cards that were found.  Is that correct?

16   A    Correct.

17   Q    Okay.

18        MR. BAUMSTARK:  Your Honor, this is going to be an

19   exhibit that has not yet made it in.

20        THE COURT:  All right.

21   Q    (By Mr. Baumstark)  And did you -- did you turn any

22   documents over to the Government with regard to that?

23   A    The -- There were copies made of the cards.

24   Q    Okay.

25   A    And those were turned over.

1    Q    Okay.  Let me show you what's been marked as Defendant's

2    Exhibit B.

3              THE COURT:  We -- Okay.  That was mentioned yesterday

4    but not -- Right, got it.

5              MR. BAUMSTARK:  Correct, Your Honor.

6              THE COURT:  I have a line for it.  Go ahead.

7    Q    (By Mr. Baumstark)  Have you ever seen this document

8    before?

9    A    I'm sorry.  Can you make it a little bit larger for me?

10   Q    I can try.

11   A    Okay.  Thank you.

12   Q    Have you seen that document before?

13   A    I believe I have, yes.

14   Q    Okay.  And is this a document that you recovered from

15   PARIC?

16   A    So I'm hesitating because I'm not sure if it's a document

17   that I recovered from PARIC or requested from Enterprise.

18   Q    Okay.  But in any event, --

19   A    I saw it.

20   Q    -- you've seen it.

21   A    Yes.

22   Q    And you can verify that PARIC was in possession of this.

23   Is that correct?

24   A    Yes.

25   Q    And you can verify that PARIC turned this over to the

1    Government.  Is that correct?

2    A    Just -- It doesn't look like a full sheet, and that's

3    what I'm hesitating on.

4    Q    Well, I can push it up because I zoomed.

5    A    Okay.  All right.  Yeah, I -- It looks like an Enterprise

6    document --

7    Q    Okay.  Did you ---

8    A    -- that Enterprise would have either printed and sent to

9    us or that was in our office.

10   Q    Okay.

11        MR. BAUMSTARK:  I'm going to move for the admittance

12   of Defendant's Exhibit B at this point.

13        THE COURT:  Received.

14   Q    (By Mr. Baumstark)  I guess now that the -- I just have a

15   few questions for you about this now that the jury is able to

16   see it.

17   A    Okay.

18   Q    I'm going to attempt -- there we go -- successfully to

19   circle a part of it.  Can you tell me what that -- what that

20   indicates there?

21   A    It says, "Sold to Joseph Paric Corporation," --

22   Q    Okay.

23   A    -- with the address of our office.

24   Q    Okay.  Does that -- Is there an individual named "Joseph

25   Paric Corporation"?

1    A    No.

2    Q    Okay.  Does that seem to speak to a specific person to

3    you?

4    A    Well, I mean "Joseph" is Joe McKee's first name.

5    Q    Okay.  Is there anyone else at PARIC who goes by "Joe"

6    who would have authority to order gift cards like this?

7    A    No.

8    Q    Okay.  I wonder if you could take note of the -- I'll

9    bring it back.

10            MR. BAUMSTARK:  Judge, this is -- this has not been

11   admitted yet, so this should be ---

12            THE COURT:  Okay.

13   Q    (By Mr. Baumstark)  Okay.  Do you recognize this -- this

14   card?

15   A    I think that's what I alluded to, that a copy was taken

16   of one of those credit cards.

17            THE COURT:  Does that have a number, Mr. Baumstark?

18            MR. BAUMSTARK:  I'm sorry?

19            THE COURT:  Does that have an exhibit number?

20            MR. BAUMSTARK:  This -- This would be Defense Exhibit

21   3 or C rather.

22            THE COURT:  C, all right.

23   Q    (By Mr. Baumstark)  And I'm sorry, Ms. Judd.  Do you

24   recognize Defendant's Exhibit C?

25   A    I recognize the copy of the card.

1    Q    Okay.  And how do you recognize this card?

2    A    Well, it's one of the cards that I made a copy of for the

3    Government when they interviewed us.

4    Q    Okay.  And why did you make a copy of this card?

5    A    Because they asked me to.

6    Q    Why did they ask you to make a copy of this specific

7    card?  Where was this card from?

8    A    Well, I don't -- I don't know all the account numbers

9    that are on the debit cards or the gift cards, but those

10   particular cards, there were five of them that were ordered.

11   Q    Okay.

12   A    And two of them were found in Lisa Chapman's desk.  And

13   so I don't know -- Of the five, I don't know which one

14   specifically that one is, where that one came from.

15   Q    Okay.  Were -- Were any of these cards returned by Brian

16   after his termination?

17   A    Brian returned one card to our attorney at the time, and

18   then I picked that up from the attorney's office.

19   Q    Okay.  And can you note the last four numbers on that

20   card?

21   A    The "0594"?

22   Q    No.  If you look past there, there are four more.  I'm

23   going to circle them.

24   A    Oh.  0603.

25   Q    Okay.  And is this a fair and accurate representation of

1    the card that you forwarded to -- the copy of the card that

2    you forwarded to the Government?

3    A    Well, there were three cards that I was able to make

4    copies of, so I'm assuming that that's one of the cards I made

5    a copy of.

6    Q    Okay.

7    A    Like I said, I don't know the account numbers off the top

8    of my head.

9    Q    Okay.  But this looks like the card.

10   A    It does.

11   Q    Okay.

12        MR. BAUMSTARK:  Your Honor, at this time I'm going to

13   move for the admission of Defense Exhibit C.

14        THE COURT:  Received.

15        MR. BAUMSTARK:  Okay.

16   Q    (By Mr. Baumstark)  So as you can see, the last four

17   numbers on that card are "0603."  Is that correct?

18   A    Yes.

19   Q    Okay.  Now I'm going to move back to Defense Exhibit B.

20   Do you see this card at the top?

21   A    Yes.

22   Q    And that's No. 0603.  Is that correct?

23   A    Yes.

24   Q    Does that match Defendant's Exhibit C as far as you can

25   tell?

1    A    Yep.

2    Q    Okay.  And this is from the group of cards that were

3    shipped to Joseph McKee.  Is that correct?

4    A    Well, I don't know if they were shipped to Joseph McKee.

5    Q    Okay.  Did you review any other materials from Enterprise

6    Bank when you were conducting your investigation?

7    A    I did.

8    Q    Okay.  I'm going to show you what's been entered into

9    evidence as Defense Exhibit A.

10   A    Okay.

11   Q    Is this an exhibit you've seen before?

12   A    I -- Yes.

13   Q    Okay.  And what is Defense Exhibit A?

14   A    It's a request for a $5000 gift card.  Linda is the

15   contact at Enterprise Bank.

16   Q    Okay.  And who is that request from?

17   A    It's from Joe McKee.

18   Q    Okay.  And you had indicated that the retirement of

19   Mr. Parisoto was in late 2013 or early 2014.  Is that correct?

20   A    Yes.

21   Q    Okay.  I'm sorry.  I do have one more question about it.

22   Can you -- Can you note the date on Defense Exhibit A?

23   A    Yeah.  I note the date.  I also remember finding this in

24   Brian's office, and I remember asking Joe if he signed that,

25   and he said he didn't recall signing it.

```
 1   Q     So he told you that he didn't recall signing it.  Is that
 2   correct?
 3   A     He said, "I could have but I don't remember this
 4   document."
 5   Q     Okay.  Do you see the date on that?
 6   A     I do.
 7   Q     That's January 8th, 2014.  Is that correct?
 8   A     Yes.
 9   Q     Do you have any reason to believe that that's not an
10   accurate representation of when this -- when this letter was
11   mailed?
12   A     I'm assuming, based on what I'm reading, that it's
13   accurate.
14   Q     Okay.  Well, I want to show you something else that may
15   help you out with that.  Let's go back to Defense Exhibit B.
16   Now you remember Defense Exhibit A was a letter mailed on
17   January 8th, 2014, requesting $5000 in gift cards.  Defense
18   Exhibit B, the receipt for the gift cards, appears to have
19   been issued on January 10th, 2014.  Is that correct?
20   A     Yes.  It looks like it.
21   Q     Okay.  So do you have any reason to doubt that that
22   letter was issued on January 8th, 2014?
23   A     You're asking me a question about something that if I
24   hadn't have found documents with signatures on things that
25   didn't exist, I would answer in a logical way.  It's hard for
```

```
 1   me to answer that question because I doubt a lot of things

 2   related to signatures.

 3   Q    Okay.  Let me ask you this:  Were these gift cards

 4   shipped to PARIC on December 10th, 2014?

 5   A    I don't know.  They weren't shipped to me.  They were

 6   discovered after Brian left PARIC.  I don't know what -- when

 7   they were shipped or when they were received or who received

 8   them.

 9   Q    But you have a record that it was received from

10   Enterprise Bank.  Is that correct?

11   A    I think the letter shows that a request was made but not

12   that they were shipped.

13   Q    Is that not what we're looking at right now?

14   A    It says "Order Date, Print Date."  I might be missing it,

15   but I don't see a "Shipped" date on there.

16   Q    It says "Order Approved."

17   A    Right.

18   Q    "Sold To."

19   A    Right.

20   Q    And the card wound up -- with the same number wound up

21   with Brian.  Is that correct?

22   A    Yeah.  I think you were asking me about the date that it

23   shipped, and that's why I was saying I didn't see that.

24   Q    Let me ask you:  As the VP of HR, do you know if

25   Brian Paluch was in town on January 8th, 2014?
```

1    A    I have no idea.

2    Q    Okay.  So as Vice-President of HR, it's your testimony

3    today that you don't know whether the CFO was in town on

4    January 8th.

5    A    We have 300 employees.  I don't know from a year and a

6    half ago who was in the office on which day.  I could look

7    back at our records if I had that information available to me.

8    Q    Okay.  One of the other things that we talked about or

9    that you talked about with Ms. Collins had to do with salary

10   calculations.  Is that correct?

11   A    Yes.

12   Q    Okay.

13        MR. BAUMSTARK:  Judge, I'm going to get into some

14   stuff that has not been admitted.

15        THE COURT:  All right.

16   Q    (By Mr. Baumstark)  Isn't it true that you provided

17   calculations regarding Mr. Paluch's bonus to the Government?

18   A    Yes.

19   Q    Okay.

20        MR. BAUMSTARK:  Can you mark it as "D"?

21   Q    (By Mr. Baumstark)  I'm showing you now what's been

22   marked as Defense Exhibit D.  Does that seem familiar to you?

23   A    Yes.

24   Q    Is that a document that you provided to the Government in

25   this case?

1   A     Yeah, I forwarded that to them.  I gave that to them.

2   Q     Okay.

3         MR. BAUMSTARK:  Your Honor, at this point I would

4   move for the admission of Defense Exhibit D.

5         THE COURT:  Is it -- Can you identify it as "BMP

6   Incentive Analysis"?

7         MR. BAUMSTARK:  Yes, Your Honor.

8         THE COURT:  Received.

9         MR. BAUMSTARK:  Okay.

10  Q     (By Mr. Baumstark)  And I want to call your attention to

11  one specific portion of Defense Exhibit D and that is this

12  number.  I didn't do a great job with my circle.  I'm going to

13  try again.  It's a little better.  What does that mean?

14  A     That means that a negative $2342 -- Shows us the

15  difference on his 2012 incentive.

16  Q     So that shows that actually in 2012, according to this

17  calculation which you forwarded to the Federal Government,

18  that Brian was actually underpaid on his bonus by $2300.

19  A     Yes.

20  Q     Is that correct?  Okay.

21        MR. BAUMSTARK:  And, Judge, I'm going to get back

22  into a new one.

23        THE COURT:  Okay.

24        MR. BAUMSTARK:  I think you're already there.  Can

25  you mark this?

```
 1    Q    (By Mr. Baumstark)  Do you recognize Defense Exhibit E?

 2    A    I do.

 3    Q    Is that a document that you forwarded to the Government?

 4    A    Is there a title or anything at the top of that?

 5    Q    There's not.  If you look at the bottom, all there is is

 6    a Bates label.

 7    A    Yeah.  I'm not sure what that -- I'm not sure what that

 8    is.

 9    Q    Is it your testimony that you did not forward this to the

10    Government?

11    A    I may have.  I don't -- I don't recognize what that

12    document is.  I asked you about is there anything at the top

13    to indicate --

14    Q    Yeah.

15    A    -- if it's titled something or ---

16    Q    There's -- There's not.

17    A    Okay.

18    Q    Does this reflect the numbers that you were talking about

19    with Ms. Collins earlier?

20    A    That the 188 was his current base at the time?  I don't

21    know what year this is, but the 188 versus the 197 --

22    Q    Yes.

23    A    -- difference?  Yeah.

24    Q    Okay.  So this does reflect the numbers you were talking

25    about earlier.
```

1    A    Yes.

2    Q    And you believe you may have forwarded this to the

3    Government?

4    A    I could have.

5    Q    Okay.

6    A    These numbers look familiar, so.

7          MR. BAUMSTARK:  Okay.  Your Honor, at this time I'm

8    going to move for the admission of Defendant's Exhibit E into

9    evidence.

10         MS. COLLINS:  Your Honor, I'm going to object on lack

11   of foundation.  What is it?  What is the document?

12         THE COURT:  Well, maybe it can be linked up at

13   another time.  At this time she testified she doesn't know

14   what it is, but perhaps someone else can identify it later.

15         MR. BAUMSTARK:  Okay.

16   Q    (By Mr. Baumstark)  Okay.  Let's see.  In 2013 the bonus

17   pool was reduced from 90 percent to 70 percent.  Is that

18   correct?  I'm sorry.  That would have been in 2014.

19   A    I don't -- I'm not sure.

20   Q    Okay.  Do you recall whether letters were issued to PARIC

21   employees indicating that that had happened?

22   A    When were they -- When were they issued?

23   Q    Well, I'm going to mark this as Defense Exhibit F.

24         THE COURT:  No. F?

25         MR. BAUMSTARK:  Yes.

80

1    Q    (By Mr. Baumstark)  Do you recognize that?

2    A    Can I see the whole page here?

3    Q    I can try to zoom out.  It's ---

4         MR. WARE:  That Bates is?

5         MR. BAUMSTARK:  It's 508.

6         MR. WARE:  508?

7         MR. BAUMSTARK:  Yes.

8    A    I'm sorry.  You're asking if I recognize it?

9    Q    (By Mr. Baumstark)  Yes.

10   A    I don't -- I mean it looks familiar, but I don't know

11   what it's from.  I'm used to seeing a different -- a different

12   communication, the ones that we went over earlier.

13   Q    Do you know whether this is something that you forwarded

14   to the Government?

15   A    It looks like it was maybe folded back from another page

16   up in this top left-hand corner.  And so if there was a cover

17   page on it, I might be able to answer that more accurately.  I

18   just -- I don't see that it's signed by anybody, and so I'm

19   having a hard time tying it to one ---

20   Q    Okay.  So if I'm understanding your testimony correctly,

21   you're saying you don't know whether you forwarded this to the

22   Government or not.

23   A    I don't know.

24   Q    Okay.  Does this refresh your recollection as to whether

25   or not the bonus pool was reduced in 2014?

1    A    We do two different payouts.  We do one at year end and

2    one after the books close, and we pay out the additional part

3    in 2014.

4    Q    Understood.

5    A    So I'm not -- This looks like it could be accurate.  I

6    just -- This isn't something that I'm comfortable saying I

7    know definitively what it is.

8    Q    Okay.  So you don't remember whether your bonus pool got

9    reduced in 2014.  Is that correct?

10   A    Well, it -- it did get reduced in 2014, the second half

11   of the '13 payment.

12   Q    Okay.  Reduced -- Reduced from what to what?

13   A    I don't -- That looks right.

14   Q    This appears to be correct to you?

15   A    Well, it does.  I mean I don't know the numbers.  We have

16   numbers every year and they're adjusted, and I don't know

17   without looking at my documents from the office to say for

18   sure was it 90 to 70 or 85 to -- You know, I just don't recall

19   it off the top of my head.

20   Q    Okay.  When is the second part of the bonus?  You had

21   mentioned that the bonus is given in two parts, correct?

22   A    Correct.

23   Q    The first part occurs when?

24   A    The first part occurs mid-December.

25   Q    And the second part occurs?

1    A    Before the end of the first quarter.

2    Q    And the first -- When does the first quarter end?

3    A    March.

4    Q    Okay.  When you say before the end of the first quarter,

5    is it within days?

6    A    Well, it's after the audit is completed and to make sure

7    there are no issues on the books that would affect that final

8    payout, so there's not a specific date.  It's before the end

9    of the first quarter.

10   Q    Okay.  And the audit, would that be the FMI audit?

11   A    No.

12   Q    Okay.  Do you know when that was completed in 2014?

13   A    I don't.  That's an accounting function, --

14   Q    Okay.

15   A    -- so I wouldn't have been involved in that.

16   Q    Okay.  I'll move on.  Okay.  We actually -- We looked

17   at --

18            MR. BAUMSTARK:  Your Honor, if we could approach.

19            THE COURT:  Sure.

20            (Bench conference on the record with counsel and the

21   Court:)

22            THE COURT:  I managed to destroy the microphone this

23   morning.

24            MR. BAUMSTARK:  Congratulations.

25            THE COURT:  I'll probably get a bill.

1           MR. BAUMSTARK:  A portion of Exhibit 24 was

2   actually -- that -- that was not displayed.  It's actually

3   what I just tried to get admitted as one of Defendant's

4   exhibits.

5           THE COURT:  Okay.

6           MR. BAUMSTARK:  I just wanted to make sure that it

7   was clear that I was taking this out of the Government's file

8   so nobody thinks I'm trying to put something up.  Actually

9   here's the other portion right here.  These are two pages.

10          THE COURT:  You want this all to be a part of Defense

11  Exhibit F?

12          MR. BAUMSTARK:  It's already in as Government's

13  Exhibit 24.  I don't see the reason ---

14          MR. WARE:  No.  We couldn't admit it because she

15  wasn't -- she couldn't testify as to what it was.

16          MR. BAUMSTARK:  Okay.  Then I guess we'll move on.

17          THE COURT:  All right.

18          MS. COLLINS:  Remember, I just showed her the

19  signature?

20          MR. BAUMSTARK:  Oh, okay.  I'll move on then.

21      (End of discussion at side bar.)

22          THE COURT:  (To The Jury)  I have nightmares about

23  listening to that white noise for the rest of my life.

24          MR. BAUMSTARK:  Judge, this is not admitted at this

25  time.

```
 1              THE COURT:  Okay.

 2   Q    (By Mr. Baumstark)  I'm going to show you -- This is the

 3   same document that Ms. Collins showed you or one of them, and

 4   you had commented on your signature.  Is that correct?

 5   A    Correct.

 6   Q    Okay.  What is this form?

 7   A    That looks like one of the incentive worksheets.

 8   Q    Okay.  Was your signature required on these?

 9   A    Yeah.  Yes.

10   Q    Your signature was required on incentive worksheets?

11   A    I mean we don't have a policy that says who's required,

12   but as the VP of HR, I was asked to sign it.

13   Q    Okay.  So you -- It's your testimony now that you were

14   asked to sign this.

15   A    Well, I don't know which version that is.

16   Q    Okay.  Okay.  So another thing that you -- that you

17   talked to Ms. Collins about earlier today was the bonus

18   calculations and the different iterations, you know.  She

19   showed you a number of different sheets which you claim to

20   have found in my client's desk.  Is that correct?

21   A    Yeah.  We talked about the incentive worksheets.

22   Q    Incentive worksheets, that's correct.  But you weren't

23   involved in the bonus calculation process.  Is that right?

24   A    The bonus calculation process, I think I described, has

25   several components to it.
```

```
1    Q    Okay.

2    A    And so I was involved in the scoring of our employees --

3    Q    Okay.

4    A    -- and the talent review process.

5    Q    But you weren't involved in the actual -- the math.

6    A    No.

7    Q    Okay.  So you don't know whether it was unusual for a

8    spreadsheet to be amended throughout the approval process.

9    Isn't that right?

10   A    Well, I think there are different -- That's why I said

11   that I don't know what version it is.  It -- It would be

12   adjusted.  The scores for performance would be adjusted.

13   Q    Okay.  And is it fair to say you don't know how many

14   times that would happen in any given year?  It could vary.

15   A    It could vary.

16   Q    Okay.  And is it -- is it fair to say that the

17   spreadsheet could be amended within the final week?

18   A    Yes.

19   Q    Okay.  And is it fair to say that you can't say whether

20   amendments might have happened even after some previous

21   version had been signed?

22   A    True.

23   Q    Okay.  I want to talk a little more about some of the

24   signatures that you found in the desk.  You've offered a fair

25   amount of opinions about what signature looks like what
```

1    signature.  You remember that, right?

2    A    (Affirmative gesture).

3    Q    Okay.  You don't have any kind of training in handwriting

4    analysis, do you?

5    A    I don't.

6    Q    Okay.  And you don't have any certifications as related

7    to that.

8    A    No.

9    Q    Okay.  And I think it was Government's Exhibit No. 20-H.

10   You talked about an order from Omaha Steaks that struck you as

11   strange that Mister -- that -- that Brian would have it.  Is

12   that correct?

13   A    Yes.

14   Q    And that's because you mentioned that Joe McKee's

15   Executive Assistant usually made those orders.  Is that

16   correct?

17   A    Yeah.  And I think that exhibit -- I don't recall the

18   exact exhibit number, but the Omaha exhibit that was presented

19   appeared to have Brian's writing on it.

20   Q    Okay.

21   A    That's why I thought it was strange; that if she had

22   ordered it and placed the order, why was it in his things with

23   his writing on it.

24   Q    And what was -- what was her name again?

25   A    Marjorie White.

1   Q     Did she work for anybody other than Joe McKee?

2   A     She would do work for other people in the company, I

3   mean, but technically she reports to Joe.

4   Q     Hadn't she been Brian's Executive Assistant?

5   A     No.

6   Q     Okay.  And you commented on Government's Exhibit 20-I

7   which had to do with a gift card -- I'm sorry -- bonus point

8   redemptions, and you stated that it struck you as strange,

9   even though you don't know how that system worked.  Is that

10  correct?

11  A     Right.  So I -- As I was pulling information, not knowing

12  what it was I was looking for, I would ask for clarification

13  throughout the items that I discovered.  And that's how I knew

14  that the other execs were not redeeming points.  So I didn't

15  go into the process knowing what I was looking for.

16  Q     Okay.  So ---

17  A     Is that ---

18  Q     Yeah.  So you didn't understand the system, correct?

19  A     I didn't know what I had.  I didn't know what this was.

20  I thought it was strange that it had his name on it, that

21  there were different cards associated with American Express.

22  And so I asked the assistant does Joe, does Keith, does Todd

23  redeem points for travel, and the answer was "no."

24  Q     Okay.  Let's talk about Lisa Chapman for a minute.

25  That's a name that's come up a few times.  Does Lisa Chapman

```
 1   still work at PARIC?

 2   A     No.

 3   Q     Well, what happened?

 4   A     Lisa was let go.

 5   Q     And why was that?

 6   A     She was let go because she -- I'm trying to think of all

 7   the facts around it.  Essentially she had used company money

 8   to pay for part of her children's high school tuition costs.

 9   Q     She was essentially terminated for stealing.  Is that

10   correct?

11   A     Yes.

12   Q     And after Ms. Chapman was terminated for stealing, she

13   returned to you an envelope containing over $3000 in cash.  Is

14   that correct?

15   A     $3300.

16   Q     Okay.

17              MR. BAUMSTARK:  Nothing further at this time.

18              THE COURT:  All right.  Redirect?

19                         REDIRECT EXAMINATION

20   QUESTIONS BY MS. COLLINS:

21   Q     Ms. Judd, defense counsel just asked you about

22   Lisa Chapman.

23   A     Yes.

24   Q     Okay.  And you said that she was terminated for -- for

25   what?
```

1    A    She was terminated because we found that checks were

2    issued from PARIC to Ursuline Academy which is her daughter's

3    high school.  So payments were made over several years to

4    Ursuline Academy which was not a vendor or a subcontractor or

5    a charity that we supported.

6    Q    And who is Ms. Chapman's or who was Ms. Chapman's

7    supervisor?

8    A    Brian.

9    Q    And was it determined when looking through the checks

10   that was sent to Ursuline Academy from PARIC that Mr. Paluch

11   approved those payments?

12   A    Yes.

13   Q    And Lisa -- And just to be clear, Lisa Chapman was let go

14   for stealing after Mr. Paluch was terminated, correct?

15   A    Yes.

16        MS. COLLINS:  Can I see Government's Exhibit F --

17   Defendant's Exhibit F?

18   Q    (By Ms. Collins)  Ms. Judd, defense counsel just asked

19   you about this.

20        MS. COLLINS:  And this is -- this is in evidence,

21   Your Honor.

22        THE COURT:  Yes.

23        MS. COLLINS:  Can we publish it to the jury?

24        THE COURT:  Yes.  It's in evidence, yep.  That's what

25   you call being asleep at the switch.

 1          MS. COLLINS:  That's okay.  It's getting late.

 2     Q    (By Ms. Collins)  Defense Exhibit D was shown to you,

 3     correct?

 4     A    Yes.

 5     Q    Okay.  And this was a document that you forwarded to the

 6     Government, correct?

 7     A    Yes.

 8     Q    And the calculations were done by whom?

 9     A    The calculations were done by our Payroll Manager,

10     Clara Zientara.

11     Q    Okay.  And the date that this was printed is September

12     23rd of 2014?

13     A    That's what's on the sheet.

14          MS. COLLINS:  Your Honor, this is not in evidence

15     yet, the next sheet.

16          THE COURT:  Oh, I'm sorry.  I thought -- No. D?  I

17     show -- I show No. D -- Oh, you mean the one coming up.

18          MS. COLLINS:  The one coming up.  It's going to be

19     Government's Exhibit 18-A as in "apple."

20     Q    (By Ms. Collins)  Ms. Judd, do you recall forwarding this

21     spreadsheet to the Government?

22     A    Yes.

23     Q    Okay.

24          MS. COLLINS:  Your Honor, I ask for the ---

25     Q    (By Ms. Collins)  And what is it?

1    A    It's a recalculation of incentive payments.

2         MS. COLLINS:  Your Honor, I ask for the admission of

3    Government's Exhibit 18-A as in "apple."

4         THE COURT:  Okay.  Received.

5    Q    (By Ms. Collins)  Okay.  So this recalculation is January

6    24th of 2015 is the date on that, correct?

7    A    July 24?

8    Q    I'm sorry.  July 24th of 2015, correct?

9    A    Yes.

10   Q    And just to put one under the other, what year is there a

11   difference?

12   A    2012.

13   Q    Okay.  Did Clara recalculate what she had done?

14   A    The one dated July 24th, 2015, was recalculated by our

15   Accounting Director, Chris Franklin.

16   Q    And was it determined that Clara had made a mathematical

17   error?

18   A    Yes.

19   Q    And that, in fact, in 2012, which is Government's Exhibit

20   18-A, that, in fact, there was not a negative; that

21   Mr. Paluch -- that there was an overpay of $2,608?

22   A    Yes.

23   Q    Now defense counsel asked you about the different

24   variations of the incentive spreadsheets, and that -- or modi

25   -- and that there are different -- There's the same

1    spreadsheet that's in it, but there's different additions and

2    subtractions and deletions.  It's a work in progress

3    essentially, --

4    A    Right.

5    Q    -- correct?

6    A    Yes.

7    Q    And you said it would not be unusual for there to be

8    amendments to that spreadsheet, correct?

9    A    Correct.

10   Q    And you were referring to different scores that are

11   amended, correct?

12   A    Right.

13   Q    Would you find that it would be unusual for a

14   modification to be made to someone's salary to be higher than

15   what that person actually made?

16         MR. BAUMSTARK:  Your Honor, I would object to that

17   question.  It calls for speculation and it's argumentative.

18   This witness has testified already that the only aspect of

19   this process that she was involved in was putting in the

20   employee ratings.

21         THE COURT:  I think so without further foundation.

22   If you want to explore it further, I'll hear it, but sustained

23   at this time.

24         MS. COLLINS:  Okay.

25   Q    (By Ms. Collins)  You said that it was -- You said on

1    Cross that you thought that it would not be unusual for there

2    to be amendments to the worksheet, correct?

3    A    Correct.

4    Q    I'm asking if it is -- it would be unusual for there to

5    be amendments to the salary.

6         MR. BAUMSTARK:  Your Honor, ---

7    A    The salary was never adjusted.

8         THE COURT:  Okay.  Wait just a minute.  Go ahead.

9         MR. BAUMSTARK:  It's the same objection I just made.

10        MS. COLLINS:  It's a clarification to the question

11   that he asked on Cross.

12        THE COURT:  Do you understand -- Do you understand

13   what is being asked?

14        THE WITNESS:  Yes.

15        THE COURT:  And is this something which you were

16   familiar in so that you are in a position to make that

17   clarification?

18        THE WITNESS:  Yes.

19        THE COURT:  Okay.  All right.  Overruled.

20        MS. COLLINS:  Well, Your Honor, we had talked on

21   Direct.

22   Q    (By Ms. Collins)  And I will reask you.  You are part of

23   the Executive Board, correct?

24   A    Yes.

25   Q    And you are one of the members that reviews the

1  spreadsheets in their different forms of completion, correct?

2  A    The only thing that's reviewed for the incentive payments

3  is the employee's score.  The salary review process doesn't

4  take place until January.  So the base salaries are never part

5  of anything that's adjusted in the different versions.

6  Q    Thank you.  Now defense counsel asked you about a gift

7  card for a thousand dollars that Mr. Paluch returned after his

8  termination, correct?

9  A    Yes.

10  Q    And they were also showing you some documents asking

11  that -- whether or not this particular gift card was ordered

12  by Mr. McKee, correct?

13  A    Right.

14  Q    Now the thousand dollar gift card that -- this particular

15  one that we've been talking about for the retirement of

16  David Parisoto; is that correct?

17  A    Yes.

18  Q    If the gift card that defense counsel asked you about is,

19  in fact, that same gift card, I don't know if it is, --

20  A    Right.

21  Q    -- it was returned by Mr. Paluch?

22  A    If it's the same one that they're referring to.  One was

23  returned from Mr. Paluch.

24  Q    Why would a gift card that's supposed to be for the

25  retirement of Mr. Parisoto be at the home of Mr. Paluch?

1    A    I don't know if it was at his home.  It was returned with

2    other items from his home to our attorney based on what our

3    attorney told me.

4    Q    Okay.  Now defense counsel asked you about when you left

5    PARIC and that Joe McKee was angry.  Is that the emotion

6    that -- that you agreed that he was?

7    A    He was -- It felt like he was angry.  He was upset.

8    Q    Okay, upset.  But he didn't hold any grudges against you,

9    did he?

10   A    I don't think so.

11   Q    In fact, he hired you back, correct?

12   A    Yes.

13   Q    And he promoted you?

14   A    Yes.

15   Q    Was Mr. McKee upset with the termination of Mr. Paluch?

16   Was he upset that Mr. Paluch was going to be let go?

17   A    Not in the same way he was upset when I gave my notice.

18          MS. COLLINS:  Thank you.

19          MR. BAUMSTARK:  Your Honor, if I could have

20   permission to go over this on Cross.

21          THE COURT:  Well, I don't think so, but we'll take it

22   up over the recess.

23          Do not discuss the case among yourselves or with

24   others or remain in the presence of anyone discussing it.  If

25   anyone should try to talk to you about the case, advise me

96

1   immediately.

2          Do not read, watch or listen to any radio, television

3   or new reports of the trial.  Keep an open mind until all the

4   evidence has been received and you've heard the views of your

5   fellow jurors.

6          After this trial is over, I'll expect each of you to

7   recite this same admonition.

8          Court's in recess for 20 minutes.

9          (Jury escorted to the Jury Room by the Clerk.)

10          THE COURT:  We'll talk about it.  I have to run

11   downstairs about something, and I'll be right back.  We'll

12   talk about it in a moment.

13          MR. BAUMSTARK:  Okay.

14          (Court recessed from 2:30 PM until 2:50 PM.)

15          (Discussion was had between counsel and the Court off

16   the record.)

17          THE CLERK:  Okay.  Are we ready?

18          THE COURT:  Yes.

19          (Jury seated by the Clerk.)

20          THE COURT:  Please be seated.  I've permitted a

21   question on Recross.

22                          RECROSS EXAMINATION

23   QUESTIONS BY MR. BAUMSTARK:

24   Q    Okay.  Ms. Judd, I just have one or two more questions

25   for you.

```
 1            MR. BAUMSTARK:  And, Judge, again this is not in

 2   evidence.

 3            THE COURT:  I'm sorry?

 4            MR. BAUMSTARK:  This is not in evidence.  I just want

 5   to make sure that the screen is shut down.

 6            THE COURT:  Okay.  All right.

 7   Q    (By Mr. Baumstark)  You recall discussing this document

 8   where you said you questioned whether that was your signature

 9   on it.  Is that correct?  Do you recall that?

10   A    Yes.

11   Q    Okay.  And you recall that I had asked you whether your

12   signature would have been required on an incentive worksheet.

13   Do you recall that?

14   A    Yes.

15   Q    And you recall that your answer was "yes"?  And you

16   recall that your reasoning for that was because you were on

17   the Executive Board.  Is that correct?

18   A    Yes.

19   Q    Okay.  When did you get on the Executive Board?

20   A    Well, I was officially added by title, by promotion in

21   2012?  I don't even remember.  Part of the reason I'm not sure

22   is I was asked to sit in ahead of time, so I sat in for

23   several months before I was officially brought into the group.

24   So I'm -- I've been going for a long time.

25   Q    Isn't it true that in 2013 when the incentive worksheet
```

1   at issue was -- was being worked on, that my client, Brian,

2   was the Acting VP of HR?

3   A    He was the CFO and oversaw HR, but HR was always involved

4   in the incentive process.

5   Q    Okay.  You were the Director of HR at that time?

6   A    In 2013?  Yes.

7   Q    Yes.  And that means you would not have been on the

8   Executive Board, correct?

9   A    Not officially.

10  Q    Okay.

11       MR. BAUMSTARK:  Nothing further.

12       THE COURT:  All right.  You may step down.  Thank

13  you.

<u>CERTIFICATE OF OFFICIAL REPORTER</u>


I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of August, 2015.


/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER