UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
    VS.                             ) No. 4:14-CR-393(ERW)
                                    )
BRIAN PALUCH,                       )  EXCERPTED TESTIMONY OF
                                    )    THE CROSS EXAMINATION
                    Defendant.      )    OF BRIAN PALUCH
_____)


JURY TRIAL PROCEEDINGS -- VOLUME V
BEFORE THE HONORABLE E. RICHARD WEBBER
August 7, 2015
ST. LOUIS, MISSOURI


FOR THE PLAINTIFF:

    JOHN J. WARE
    DIANNA R. COLLINS
    OFFICE OF U.S. ATTORNEY
    111 South Tenth Street, Suite 2000
    St. Louis, MO  63102
    (314) 539-2200

FOR THE DEFENDANT:

    LUKE A. BAUMSTARK
    BURTON H. SHOSTAK
    COSGROVE LAW GOUP, LLC
    7733 Forsyth Boulevard, Suite 1675
    St. Louis, MO  63105
    (314) 563-2490


    Proceedings recorded by mechanical stenography;
transcript produced by computer.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

1   (The following is the excerpted testimony of the Cross

2   Examination of BRIAN PALUCH reported on August 7, 2015, in re:

3   USA v. BRIAN PALUCH; Cause No. 4:14-CR-393(ERW):)

4           THE COURT:  Recalculating.  Would you return to the

5   stand?

6           Mr. Ware is ready to start his Cross Examination.

7                       CROSS EXAMINATION

8   QUESTIONS BY MR. WARE:

9   Q   Mr. Paluch, let's start on something that I think we can

10  agree on and that's Lisa Chapman.  You tried to help

11  Lisa Chapman, did you not?

12  A   Yes.

13  Q   Okay.  Her husband, who was a chef, had heart problems

14  and could no longer go to work, --

15  A   Yes.

16  Q   -- correct?

17  A   Yes.

18  Q   Okay.

19  A   As I understood it, yes.

20  Q   She had a daughter that went to school at Ursuline,

21  correct?

22  A   Yes.

23  Q   Okay.  She had -- She came to you and said, "I've got

24  this vacation time.  Can I not use my vacation time and get

25  paid instead," correct?

1    A    No, that's incorrect.

2    Q    How -- What's incorrect about that?

3    A    I actually stimulated that conversation.

4    Q    Okay, fair enough.  You saw that she needed some money;

5    the family needed help.  You brought that to her and said,

6    "Look, why don't we do this."

7    A    Yes.

8    Q    And she agreed.

9    A    Yes.

10   Q    Okay.  And so did you get approval from Joe to do that?

11   A    No, I did not.

12   Q    Okay.  So ---

13   A    I wouldn't have needed it.

14   Q    Wouldn't have needed it?

15   A    Not per our rules of authority, no.

16   Q    Okay.  And then -- So she -- The first -- This happened

17   in successive years, about four years; correct?

18   A    Oh, yeah.  We probably did it longer than the indictment,

19   yes.

20   Q    Okay.  At least starting about '09 perhaps.

21   A    It's possible, yes.

22   Q    Okay.  And so -- And her week -- her week -- She took

23   about a week that she worked through and didn't take her

24   vacation.  You paid her for that week.

25   A    Yes.

1   Q    Roughly about $2000?

2   A    Yes.

3   Q    Okay.  And instead of writing a check directly to her,

4   you wrote it to Ursuline, correct?

5   A    No.

6   Q    For -- For all four years you didn't -- you didn't write

7   the check to Ursuline?  You wrote it to her?

8   A    I have no ability to write a check.

9   Q    All right.  You approved the check to Ursuline.

10  A    I approved a check that said, "Donation to Ursuline,"

11  yes.

12  Q    Okay.  All right.  The point being that it went to

13  Ursuline from Lisa Chapman.  It was paying for her daughter's

14  tuition, correct?

15  A    How would I know that?

16  Q    Well, Lisa Chapman says, "Hey, I want to code this check

17  to Ursuline for a charity donation," and that's the check in

18  the amount of what her week off would have been, correct?

19  A    No.  The amounts are much larger than that.

20  Q    You put more in than that.

21  A    I didn't put anything in.

22  Q    Well, how did you -- If these checks that are going to

23  Ursuline aren't compensation for her not taking her week off,

24  what did you do with her money?

25  A    It was the PTO.  I paid her at year end.  These

1    conversations regarding PTO, Mr. Ware, happened in December,

2    not in July.

3    Q    Well, those checks happened in August.

4    A    The Ursuline checks.

5    Q    Yeah.

6    A    Yeah.  But the PTO payments that she got happened in

7    December.

8    Q    Okay.  So I guess I've got this wrong.  Is that right?

9    A    It appears.

10   Q    And Lisa Chapman's got it wrong, too?

11   A    It would appear.

12   Q    Okay.  So if she came to the stand next week and said

13   something different, she'd be lying?

14          MR. BAUMSTARK:  Objection, Your Honor.  It's asking

15   the witness to speculate -- to comment on the testimony of

16   another.

17          THE COURT:  Yeah, sustained.

18   Q    (By Mr. Ware)  All right.  I thought we could agree on

19   that.  Apparently we can't, so we're -- we're off our areas of

20   the agreement.  Okay?

21          Let's start with you saying that you ran the

22   Marketing Department at PARIC.  Is that what you said?

23   A    I said I was responsible for the marketing budget for

24   three years, yes.

25   Q    Oh, the marketing budget.  You were responsible for

1    handling the payments, not that you ran Marketing.

2    A    Oh, no.  I was responsible for handling marketing.  I ran

3    the brand rollout, yes.

4    Q    Okay.  Because, you know, Mr. Meeks was here.  He

5    testified today.  He didn't say that.  He said some other

6    fellows ran Marketing.

7    A    When he was here, yes, the other fellows did.  Mr. Meeks

8    was terminated before that.

9    Q    Well, you said 2010, 2011, 2012.

10   A    Yes.

11   Q    And you were the marketing guy.

12   A    I was responsible for marketing, yes.  Sara Jalursik (ph)

13   reported to me, yes.

14   Q    And so Mr. Meeks would be wrong about that.

15   A    I guess he would be, yes.

16   Q    Okay.  So that's your own witness that's -- that got it

17   wrong.

18   A    It wouldn't be the first witness that we -- that got

19   something wrong, Mr. Ware.

20   Q    All right.  Let's go to December 1st, 2011.  Your

21   explanation on your, quote, "summary sheets" is that you

22   aggregated to make things easier.  Is that correct?  Easier

23   for coding.

24   A    My point of aggregating was to get it into summary

25   account codes, yes.

1   Q    Okay.  Now that's extra work actually, isn't it?

2   A    No.  By actually going ahead and summarizing it gave a

3   better description in the general ledger.  Otherwise, it would

4   have just shown up as "December AMEX."

5   Q    Well, here's -- here's, you know, your -- your summary

6   sheet that -- This came by electronic form, correct?  And

7   American Express generated some of this already, correct?

8   A    Yes.

9   Q    Okay.  And so -- And it would have been by point of

10  transaction.  Each transaction would have had its own line,

11  correct?

12  A    Correct.

13  Q    So the aggregate -- You would have had to have gone into

14  the electronic thing and made different calculations.

15  A    Yes.

16  Q    So -- So that's extra work, isn't it?

17  A    Extra work for me, but if I didn't do that, somebody

18  would have to put every one of those line items in our general

19  ledger, and we didn't want that much detail in it.

20  Q    And, yet, it was only your stuff that you aggregated.

21  Isn't that true?

22  A    Again, if you look at the AMEX experience for the whole

23  company, I was 50 percent of the bill.

24  Q    The answer to the question is:  You only did it on your

25  stuff, correct?

1    A    That is incorrect.  We also aggregated on Joe's.

2    Q    And your explanation is you create this fake bill for

3    Omaha Steaks for the exact amount of stuff that you wanted to

4    code for whatever purpose.  That -- That's your explanation,

5    correct?

6    A    Is that a real question?

7    Q    Yeah.  I'm asking you.  Is that your -- Is that your

8    testimony?

9    A    That is not my testimony, no.

10   Q    Okay.  What is your testimony about that?

11   A    My testimony, as I stated earlier, was this was a summary

12   per this account code.

13   Q    Hold on a second.  You said you aggregate things to make

14   it easier.  So we've got this Omaha Steaks fake entry.  That's

15   not a real entry, correct?  That didn't really happen,

16   correct?

17   A    No.

18   Q    Okay.  You put that in there to, quote, "aggregate" other

19   charges.

20   A    If you could, please, move the sheet that you have there

21   to your left so we can look at the description.

22   Q    You want it this way?

23   A    Yeah.

24   Q    Okay.

25   A    What it says in there is "Customer Holiday Gifts," and

1   that's where it was charged to.  So, yes, the vendor is wrong

2   but the description is correct.

3   Q    Okay.  Why -- Why put "Omaha Steaks" in a fake receipt

4   behind that document?  Why not put the real receipts?

5   A    The statement had all of the real receipts.

6   Q    No.  You're saying that the statement has the receipts to

7   the Cardinals, to Beverage Factory, to NV Tours, Morningside?

8   That's what you're saying?

9   A    All of ---

10  Q    You submitted the real receipts?

11  A    All of those things would be on the AMEX statement that

12  was in the file, yes.  Those are not adjusted.

13  Q    No, I know.  The AMEX gets it right, but you didn't

14  submit those receipts.  You submitted a fake Omaha Steaks

15  receipt, right?

16  A    Could I see the receipt?

17  Q    Sure.  We'll find it for you.  What I did notice is

18  there's no Morningside Vineyard receipt, Rhodes Ranch receipt,

19  Paradigm Winery receipt.  None of those receipts are attached.

20  Are you going to agree with me on that one or do you want to

21  look at it?

22  A    No, I don't need to look at it, but in your own testimony

23  from one of your earlier witnesses, there was a file of AMEX

24  receipts.  They should have been in there and they were.

25  Q    The file of AMEX receipts, what are you talking about?

1    A    You -- You received a box from PARIC.

2    Q    Government's Exhibit No. 20, the stuff that was taken off

3    of your desk?

4    A    Well, taken out of my office, not off my desk, but yes.

5    Q    Okay.  And so you kept that file?

6    A    I kept a -- Right in my lower right-hand corner I kept

7    all the chits that I did not attach to AMEX that I aggregated

8    in the lower right-hand corner.

9    Q    So why not attach it to the stuff that gets approved?

10   A    Again, I don't know how many times I can say this.  I was

11   summarizing and that's what I did.  You can argue that it's

12   not right, but that's what I did.

13   Q    And you didn't tell Mike Rallo you were, quote,

14   "summarizing."

15   A    No, because he would look at the expenses for

16   reasonableness, anyway.

17   Q    Right.  And if you -- And if you put the Morningside

18   Vineyard for your Napa vacation, he'd go, "That's not

19   reasonable."

20   A    It's not a Napa vacation, Mr. Ware.

21   Q    Wait.  That trip to Napa was not a vacation?

22   A    No.

23   Q    Oh, that was a business trip?

24   A    Yes, sir.

25   Q    Okay.  Who -- Who knew that?

1   A    I did.

2   Q    Okay.  Nobody else, just you knew that was a business

3   trip.

4   A    I guess that's true.

5   Q    All right.  Let's go to December 1st of 2013.  Just one

6   other point to point out.  December 1st of 2011 also has a

7   Waterway charge on it because it's that time of year.  It's up

8   here.

9   A    I see it, yes.

10  Q    Yeah.  Waterway, $8,348.  And how do you comment that?

11  A    "Company Waterway Memberships."

12  Q    And -- And you code it a particular way?

13  A    At that particular time we were putting it all to the

14  corporate account.  In the 2013 we were breaking it out by

15  department.

16  Q    Yeah.  Okay.  So you coded it "71350; Company Water

17  Memberships -- Waterway Memberships," right?

18  A    Yes.

19  Q    All right.  So here's -- here's the Omaha Steaks fake

20  receipt.  It's Government's Exhibit 20.  Okay?  And then you

21  put "14" on the top which matches the -- the location on the

22  summary, correct?  That's how you did your receipts?

23  A    Yes.

24  Q    Okay.  So that's what you put, but that was fake.  You

25  didn't put the real ones.  So that's -- that's, I guess, the

1    only point I was making.  You agree to that?

2    A    It looked real to me.  I'm not sure what that says.

3    Q    Well, we know it's not --

4    A    When you ---

5    Q    -- we know it's not real because we got the Omaha Steaks

6    records.

7    A    Okay.

8    Q    And they show no -- This was not an order.  It's a --

9    It's a, quote, "Order Summary," but it was never transacted.

10   A    Ahh.

11   Q    Yeah?

12   A    Okay.

13   Q    Okay.  Which means that you actually got online to Omaha

14   Steaks, created an Order Summary for the exact -- to the penny

15   to what you put on as personal charges to submit to fake

16   Mike Rallo out.  That's what that means.

17   A    No, it doesn't mean that.  Mr. Ware, I think we've gone

18   through those other expenses and determined that they're valid

19   business expenses.

20   Q    No, no.  Remember, only you say that.  Only you say that

21   Napa vacation was a business expense.  Nobody else thinks

22   that.

23         MR. BAUMSTARK:  Your Honor, I would object to the

24   questioning being argumentative and also misstating previous

25   testimony.

1    THE COURT:  I can't hear you, the last part.

2  Argumentative and what?

3    MR. BAUMSTARK:  Misstating previous testimony of

4  John Irace.

5    THE COURT:  Well, the jury is instructed to recall

6  the testimony as they heard it from the witness stand.

7  Overruled.

8  Q   (By Mr. Ware)  Here's December 1st, 2013.  This is the

9  one with the Waterway, and you agree that you made up a

10  Waterway receipt for that inflated amount, correct?

11  A   The Waterway summary was an Excel worksheet for us, yes.

12  Q   Okay.  But you -- you submitted a false one.  You -- You

13  -- I think you said that on Direct.

14  A   No.  I said that I basically added those other charges to

15  it because I wanted to use the account distribution.

16  Q   Okay.  Where exactly -- This is that summary renewal

17  membership for 2014, and so you're saying that all these --

18  Oh, I'm sorry; you can't see it.  You're saying that you --

19  these are those extra charges?  Is that what you're saying?

20  A   No.  Obviously, you can see in there that in the total

21  that I had by department, it says 10,850 which is already more

22  than what the bill was from Waterway.  I wanted to use those

23  account codes, and then the remainder was put in the corporate

24  account code.

25  Q   But -- But all of those are supposedly Waterway

1  memberships, correct?

2  A    I was more concerned with getting the account code.

3  You're concerned with the memberships, and I can see your

4  point, but that's not what happened.

5  Q    Wait.  Does this document -- Is it supposed to capture

6  all the Waterway memberships from PARIC for 2014?

7  A    No.

8  Q    Okay.  What is it supposed to capture?

9  A    It's supposed to capture all of the Waterway plus those

10 other charges that would have been charged to those particular

11 departments and codes.

12 Q    Okay.

13 A    That was the aggregate.

14 Q    And where does it say anywhere on this document stuff --

15 the other stuff, not the Waterway memberships?  Just tell me

16 where that is.

17 A    It would be on the AMEX statement that was in the

18 Accounts Payable file.

19 Q    Oh, no, no, no.  I'm not talking about what the actual

20 bill says.  I know what the bill says, but this receipt, this

21 one that you -- that you created, that you took --

22 Jordan Hemmann had the -- had the right one with the right

23 amount.  You created this.  Where -- Where -- Where's the --

24 Where's the stuff you're talking about?

25 A    It's in the AMEX statement.  We've gone through every

single element and explained the business purpose, Mr. Ware.

Q    Okay.  And then that's supposed to be coded.  So that stuff, that other stuff you aggregate with the Waterway because it should be coded the same way, correct?

A    Yes.

Q    Okay.

A    That was the intent.

Q    And so you code Waterway.  Now we have "Various; See Attached," correct?

A    Yes.

Q    Okay.  Not coded the same way as 2011.  I mean you said you changed it.

A    It all went to corporate in 2011, yes.

Q    Okay.  All right.  And so the department is "Various" now.

A    Yes.

Q    All right.

A    If you go back to the account code, you'll see multiple departments.

Q    And here are those other charges.  Why is you purchasing gas in the same coding group as carwashes?

A    At some point I just was aggregating because I had to finish the bill.  Fourteen dollars would not have been something I would have spent a lot of time on.

Q    Okay.  How about McDonald's?

1   A    Again, these are what I would consider the remainder of

2   the AMEX bill, and I would aggregate them on every bill.

3   Q    Okay.

4   A    You would see this type of action on every month.

5   Q    Okay.  Rosebuds is in Lexington, correct?

6   A    Yes.  There's a -- By the way, there's a $382 Waterway

7   bill.

8   Q    Yeah.  Rosebuds is in Lexington, correct?

9   A    Yes.

10  Q    Who lives in Lexington that you know?

11  A    Crista, but that would be the only person I know.

12  Q    Okay.  That would be Crista Dittert, your niece --

13  A    Yes.

14  Q    -- that you paid to get the law internship at McCarthy

15  Leonard.

16  A    Well, that would be incorrect, but yes.

17  Q    Okay.  So that gets into the "Various," too.  All right.

18  A    By the way, when the Rosebud bill happened, I was

19  actually in Chicago.

20  Q    So how did Crista get your corporate credit card number?

21  A    I'm not sure that Crista had that purchase.  Again, we --

22  we established that multiple people inside PARIC had access to

23  my credit card.

24  Q    Okay.  So somebody else from PARIC who also had their own

25  AMEX cards, their own MasterCards, somehow they got your

1  number and then while they were in Lexington, Kentucky for

2  some reason, they charged $50 to your card.  That's -- That's

3  your theory.

4  A    Well, first of all, multiple people used my card.  Second

5  of all, no one else who had an AMEX shared their card except

6  for Joe with his assistant and Mr. Rallo, Sr., with his

7  assistant.  And third, the people who have MasterCards

8  basically were the field people.  So putting all those three

9  together, Mr. Ware, is probably not a correct aggregation of

10  the statement.

11  Q    Okay.  And so these cards that you buy for Christmas

12  gifts or year-end stuff, those are the gift cards from

13  Walgreens --

14  A    Yes.

15  Q    -- or Starbucks and Bread Co., that should go with the

16  carwashes, correct?

17  A    Well, we pass those gift cards out, yes.

18  Q    Yeah.  So that makes sense.  That's the right coding,

19  carwashes and gift cards?

20  A    We were more concerned about the departments, but yes.

21  Q    Okay.

22  A    I believe the coding stands for, if you would, Mr. Ware,

23  employee expense.  I don't know the account code.  So all of

24  those things would be considered employee expense.  So to your

25  question, yes, that would be the right account code.

1  Q    Well, hey, let's look at even your trip to Chicago.  Some

2  of your Chicago trip is on this, quote, "Various," but, yet,

3  some of the trip you expense correctly.

4  A    I broke the big ones out, and I probably should have

5  aggregated those with them.

6  Q    How about you ---

7  A    You are right.

8  Q    How about you broke out the ones that you could be

9  reimbursed for for business purpose and these other ones are

10 your personal?  How about that?

11 A    That would be an incorrect "how about that."

12 Q    Now this is -- this is so minor, but I'm going to bring

13 it up just because you're wrong.  Betty Paige, you bought

14 some -- some clothing for your wife, and I guess she didn't

15 like it and you had to return it?

16 A    I had a change of heart.

17 Q    Okay.

18 A    It was a Christmas gift.

19 Q    Okay.  And you said you claimed it back, but you know

20 what?  You didn't.  The very next month you didn't -- it shows

21 up on the AMEX, but you didn't claim it on yours.  You didn't

22 correct it -- correct it.  You just claimed extra on a

23 Waterway bill.

24        The amount of effort just on that to cover up what

25 you're doing is amazing.  You're not saving any time.  You are

1  spending a lot of your time covering up what you're doing.  Am

2  I not right?

3  A    You are not right.

4  Q    Look, some of these I get.  Some of these you can't track

5  all of your business expenses.  I get that, but you've been

6  caught in a bold face lie on one of these, quote, "business

7  expenses," haven't you, with regard to Ron Laudel?

8  A    That was a misappropriate thing to write down, yes.

9  Q    That was a false statement.

10 A    Well, I was actually at the trust in Disney, yes.

11 Q    Okay.  Yeah, I know you were in Disney.  Who else was

12 down there at Disney with you?

13 A    My wife.

14 Q    Okay.  And did your kids come down and visit with you?

15 A    Yes, they did.

16 Q    Okay.  And that's that extra room, correct?

17 A    Yes.

18 Q    Okay.  And so you're having dinner with your family that

19 night.

20 A    If I -- If I did, I reimbursed them through the check

21 that I gave you, Mr. Ware.  That was the personal expenses for

22 the trust trip.

23 Q    Yeah.  And what you wrote, it was for $350, and you wrote

24 that you were having dinner with Ron Laudel, correct?

25 A    Yes.

1    Q    And by the way, I didn't pick that -- that one out.  Your

2    attorney did at random, and we just -- we noticed that and by

3    happenstance, Mr. Laudel was on the witness list, and he said

4    he wasn't even there.  So what you put is a false statement,

5    correct?

6    A    It was a false explanation, yes.

7    Q    Okay.  Let's say misrepresentation.  Fair enough?  Wait.

8    You don't need to look at him for your answer.

9            MR. SHOSTAK:  I'm going to object to that, Judge.

10   I've been fine all day long.  That's enough of that.

11           THE COURT:  Well, just proceed, gentlemen.

12   Q    (By Mr. Ware)  Answer the question.  Misrepresentation or

13   not?

14   A    Oh, I didn't know there was a question in there.  Could

15   you back it up just a bit?

16   Q    Was that statement that you were having dinner down in

17   Florida with Mr. Laudel when he wasn't in Florida and he

18   didn't go on that trip, was that a misrepresentation?

19   A    Yes.

20   Q    All right.  And the reason you did that is you got paid

21   for a personal expense, correct?

22   A    Which I reimbursed the company, yes.

23   Q    And so you've -- You defrauded the company, right?

24   Misrepresentation; you got money from it.  We'll -- We'll put

25   aside you paid the money back later.

1    A    Well, how can you put that aside?

2    Q    Because you got money from the company, correct, --

3    A    No, I didn't.

4    Q    -- and you made a misrepresentation?  We'll talk about

5    the "pay the back" later.

6    A    I didn't get money from the company.

7    Q    All right.  Was that one of the ones that you put on your

8    scorecard?

9    A    No.  I wrote a personal check for that one.

10   Q    Okay.  Boy, I'm -- I'm -- You're taking me out of order,

11   but we might as well go there.  You wrote a check for that

12   one, did you?

13   A    Yeah.

14   Q    Straight to PARIC?

15   A    No.

16   Q    To who?

17   A    I wrote it to "Cash."

18   Q    You wrote it to "Cash"?

19   A    Yes.

20   Q    Okay.  So this reimbursement thing, let's go through

21   this.  You put a charge on the corporate card.  You

22   misrepresent what it's about, but you want to reimburse the

23   company.  So you go home, and you write a check out to "Cash."

24   A    Yes.

25   Q    Then you go to the bank to cash that check.

1  A    Yes.

2  Q    And then you get that cash, and then you go to work.

3  A    Yes.

4  Q    And then you give all that cash to Lisa Chapman.

5  A    Yes.

6  Q    And you tell Lisa Chapman to take that cash to the bank.

7  A    I -- I don't tell Lisa to do anything.  I expect she'll

8  deposit it, yes.

9  Q    Well, presumably she's going to -- she's going to have to

10  go from PARIC with cash to the bank.

11  A    Yes.

12  Q    Okay.  And -- And that's how you do it for --

13  A    We had ---

14  Q    -- for a company that doesn't even like to take cash in?

15  We've had testimony about that.

16  A    I would not agree with that testimony because we took a

17  far more amount of cash in than was basically said by your

18  witness.

19  Q    Okay.  How about this; I'm sure you can agree with me on

20  this:  It would have been a whole lot easier for everybody if

21  you just would have written out a check to PARIC.

22  A    Yes, it would have.  Would you like to know why I didn't?

23  Q    I think it's self-explanatory.  It's a cover.

24  A    Unlike many of the conclusions the Government has made,

25  it's not self-explanatory, Mr. Ware.  Would you like to know

1  why we did it?

2  Q    You know, your attorney can come up and cover anything

3  that has been, quote, "misrepresented" by me.  Okay?

4  A    Okay.

5  Q    All right.  Let's talk about your incentive calculations.

6         While we're on this kind of cash reimbursement thing,

7  let's talk about the scorecard.  Where is the scorecard?

8  A    I kept the scorecard.

9  Q    Where is it?

10  A    I don't know.  I don't have access to those records

11  anymore.

12  Q    Okay.

13  A    It should have been in my desk.

14  Q    Well, you know, we got everything.  We didn't see it.

15  A    Well, you think ---

16  Q    Did you keep it in your head at all?

17  A    You think you got it.

18  Q    Did you keep it in your head?

19  A    No.

20  Q    Okay.  And then those -- those, quote, "scorecard

21  deductions" should show up on the -- on the year-end earnings

22  and wages, correct?

23  A    No, that would be incorrect.

24  Q    Why would that not be there?

25  A    Well, per the schedule that we had showed earlier, they

1   were deducted inside the incentive calculation.  And so it was

2   netted against the amount that was included on the paystub.

3   Q    Okay.  So this is Government's Exhibit 18, already in

4   evidence.  You're saying that wouldn't show up here.

5   A    You're right; it would not.

6   Q    Okay.  It just -- It shows up in this internal document

7   that you've made.

8         MR. WARE:  Luke, can I see your exhibit?  It's T.

9   Q    (By Mr. Ware)  These printouts of these incentive sheets

10   are not complete to the whole chart on the computers, are

11   they?

12   A    I'm not sure.  Could you restate that?

13   Q    In other words, the incentive spreadsheet that you

14   create, and some of them are on the computer, they're

15   extremely wide, multiple columns, that don't show up -- some

16   of those columns don't show up on some of these printed

17   documents.

18   A    That is true, but on the one that Mr. Baumstark showed

19   me, it did have that column.

20   Q    So -- So there's -- These are not -- Whatever document

21   that we -- you even see here, there's other columns on your

22   spreadsheet as original on the -- on the computer.

23   A    Yes.

24   Q    Okay.  And those columns are part of your calculations.

25   A    Some could be references.  Some could be calculations,

1    yes.

2    Q    Okay.  All right.  And so this is what you're talking

3    about, and you say that this $2000 figure is your scorecard?

4    A    In that particular year, that was my scorecard, but the

5    total scorecards for the year was 35,200 for all the

6    executives.

7    Q    Well, okay.  And how -- Who puts that number in?

8    A    I do.

9    Q    Okay.  And how do you know that that's the right number?

10   A    Depending on whose scorecard it is, we would have four --

11   In -- In my history, there were four people who utilized the

12   scorecard:  Joe McKee; Keith Wolkoff; Michael Rallo, Sr. and

13   myself.  It was available to the executives.  Joe told us all,

14   "Hey, if you need something done or whatever, you can

15   basically put it on your scorecard, and we'll take it out of

16   your year-end bonus."

17   Q    But you were the one that was responsible for overseeing

18   that.

19   A    Somebody has to be.  Yes, Mr. Ware.

20   Q    Yeah, I know.  And you do this sheet, correct?

21   A    This sheet is basically handled by four or five different

22   people, but I had control of the sheet, yes.

23   Q    And there's multiple versions of the sheet, correct?

24   A    Yes.  As we go through it, there's -- there's always

25   multiple versions until you hit the final button, and then

1    that goes to Clara.

2    Q    Okay.  And so in the prior versions of this sheet, your

3    salary is not 197,100, is it?

4    A    I couldn't speak to that.

5    Q    In fact, 197,100 is not your salary, is it?

6    A    No, it is not my salary.

7    Q    Okay.  That's inflated, correct?

8    A    No, that's not inflated.

9    Q    How is that not inflated?  How is that not your base

10   salary?

11   A    Well, that is not my base salary.  That's a different

12   question, Mr. Ware.

13   Q    Okay.  You're saying that this column is not your base

14   salary?

15   A    Yes.

16   Q    Okay.  And it says "Current" and "Base Pay."

17   A    Right.

18   Q    Okay.  But that's not what this reflects, does it?

19   A    No.

20   Q    So explain to me why your current base pay is not your

21   current base pay?

22   A    For the reasons I explained earlier, it would include the

23   taxable portion of your car allowance.  It would include the

24   taxable portion of your excess life insurance, and it would

25   include any bonuses or stipends that would have been paid to

1 some employees.  In my particular case, that wouldn't apply,

2 but it would apply to other employees, yes.

3 Q    All right.  So according to your formula, Joe McKee's

4 base pay should have changed on that form, correct?

5 A    No.

6 Q    Why?  He doesn't -- He doesn't have a car allowance?

7 A    No.

8 Q    What about Keith Wolkoff?

9 A    No.

10 Q    He doesn't have a car allowance?

11 A    No.

12 Q    What about Michael Rallo?

13 A    No.

14 Q    He doesn't have a car allowance?

15 A    No.  All three of them have company cars.  We pay all of

16 their expenses.

17 Q    Okay.  Lisa Chapman, car allowance?

18 A    Yes.

19 Q    Okay.  Give me another car allowance.

20 A    Pretty much all the execs, but depending on how they fill

21 out their car log, it could be taxable or nontaxable.

22 Q    Well, how come their base pay didn't change in the

23 different generations of this document and it was only yours?

24 A    I can't speak to that.

25 Q    Well, let's see.  This is the one with your base pay

1   changed.  That's your signature on it, correct?

2   A    The one that says, "Do not use"?

3   Q    I'm talking about this guy right here.

4   A    I'm kind of talking about the lower left.  It says, "Do

5   not use."

6   Q    Yeah.  "Original do not use"?

7   A    Okay, thank you.

8   Q    Okay.  This is supposed to be the original?

9   A    This is the original that we paid our bonuses from.

10  Q    Okay.  Is that you?  Is that your signature?

11  A    Yes.

12  Q    Okay.  And this is the one that Christie Judd said wasn't

13  hers, correct?

14  A    I have no reason why Christie Judd would even be on here.

15  Q    All right.  Well, I think she testified to that.  So this

16  original, "Do not use original," this is the one where your

17  base salary is inflated and only yours.

18  A    Only mine?

19       MR. BAUMSTARK:  Your Honor, --

20  A    I disagree.

21       MR. BAUMSTARK:  -- this question assumes all kinds of

22  facts not in evidence.

23       THE COURT:  Well, ---

24       MR. WARE:  Judge, --

25       THE COURT:  Overruled; Cross Examination.

1    MR. WARE:  -- I will point out that he says he used

2  those documents to create his chart.

3    THE COURT:  Yeah.  I've already -- I've already made

4  the ruling.  Could I -- I'm just -- I knew we were going to go

5  over a little bit.

6    MR. WARE:  It's a good time to stop.

7    THE COURT:  All right, very well.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

        I, Deborah A. Kriegshauser, Federal Official Realtime
Court Reporter, in and for the United States District Court
for the Eastern District of Missouri, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that
the foregoing is a true and correct transcript of the
stenographically-reported proceedings held in the
above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.

        Dated this 9th day of August, 2015.


                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER