UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:14CR393 ERW/DDN |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN PALUCH, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT BRIAN PALUCH'S SENTENCING MEMORANDUM**

COMES NOW Defendant, by counsel, and submits the following Sentencing Memorandum:

**I.     INTRODUCTION**

Prior to his indictment, Brian Paluch was a respected member of his community and profession. With little warning, Brian's reputation was destroyed. He was publically humiliated with press releases issued by PARIC and the Government within hours of his indictment. The months awaiting trial were filled with fear and uncertainty. The trial brought more public humiliation, and a frustrating inability to vindicate himself, at least in part.

Brian now stands before this Court as a convicted felon. He has lost his job and his profession. His career is over. Ironically, the purported victim, PARIC, has financially benefited from his serendipitous fall, rescinding or disavowing over $675,000 in severance and deferred compensation payments otherwise due Brian. Indeed, if PARIC's insurance claim is

1

granted, its most recent attack upon a departing corporate officer will garner it a net gain of almost $300,000, *before any* restitution award.[1]

The Presentence Investigation Report finally concedes a truth long obscured—that PARIC began its searching investigation immediately after Paluch's sudden termination of Brian, purportedly for his behavior towards other employees, after years of no-such complaints about his personal demeanor.  This story, of course has evolved.  PARIC then hired a former FBI agent and Assistant United States Attorney to present the case to the federal government.  It is not unfair to question the appropriateness of these events, or PARIC's true motives.  Or even the relationship between the government and its former employees when a private party solicits a government prosecution that nets the party a financial gain.

The final issue for this honorable Court to determine is what, if any, is the *least* additional punishment necessary to satisfy the demands of justice.  *See* 18 U.S.C. § 3553(a).  The primary contentions between the parties relate to Brian's state of mind—criminal or negligent—as to certain expenditures, as to whether PARIC actually obtained a benefit from others, and the resulting total-loss amount for any criminal conduct.  The court's determination as to the latter issue is critical <u>if</u> the court finds the advisory sentencing guidelines instructive as to this particular case and defendant.

This Memorandum will address other pertinent issues for sentencing.  These important factors include Brian's health, his promptly rejected proffer of financial misdeeds by PARIC, as well as his long-standing service to the needy.  Evaluating each of these factors will enable the Court to fully and fairly judge Brian in the context of his character, life to date, and the

---

[1] This point carries even more weight considering that Government has increased the amount of restitution warranted by upwards of 450 percent, from its pretrial offer of $70,000 to over $400,000.

respective impact of the events leading to his indictment upon him and his victim, PARIC Corporation.

Finally, Brian's counsel urges the court to accept the positions and suggestions herein as the experienced and respectful observations of his counsel.  Nothing is intended to minimize the defendant's conduct, assail the Government's counsel, or cast any shadow of disrespect upon the Court's experience in executing its most weighty responsibility: punishing a citizen.

## II.     WHO IS BRIAN PALUCH?

Brian is 59 years old.  He has been married to Caroline since 1981.  They have raised two children, but lost a third infant child in 1985.  Their son Matt graduated from Notre Dame in 2004.  He is an accountant.  He is to be married four months from now.  Their daughter Emily graduated from Marquette in 2011.  She lives here in St. Louis, and is a physical therapist.

Brian graduated from Marquette in 1978 and from Southern Illinois University in 1991.  He held a series of executive corporate accounting positions prior to being hired by PARIC as CFO, in 2005.

Brian's tenure at PARIC was incredibly stressful.  The conduct of his supervisor, Joe McKee, made it more so.  Beyond McKee's manipulative and passive-aggressive management style, Brian and McKee were at odds over millions of dollars in diverted revenues and questionable tax deductions.  His termination and PARIC's investigation followed the escalation of that conflict.

In October of 2013, Brian began to suffer from extreme fatigue and shortness of breath.  He had chest pains while at work.  He struggled to sleep.  In late January, 2014, Caroline insisted that he seek medical attention.  Once evaluated, he was admitted for an emergency heart catheterization and the insertion of stents.  Although Brian has severe pain from osteoarthritis in both knees, his heart medications disqualify him from eligibility for knee replacement surgery.

Brian now must carry Nitroglycerin with him at all times, as well as an EpiPen, for his heart and breathing ailments.

The Court is aware that Brian has no prior convictions, or even arrests. He has never been sued civilly or terminated from a job for any kind of alleged wrongdoing. The letters in the Appendix say more about Brian than he would ever say about himself. He is a humble person. Good people respect and admire him.

### III.   WHAT IS THE LOSS AMOUNT?

Brian has never contended that each and every expenditure the Government identified at trial, or generally alluded to before trial, was justified by PARIC's oral or written policies. He also has admitted that--even in the context of the spending culture at PARIC--he was either "unthinking" in his applications for reimbursement or, at a minimum, exercised poor judgment or a lack of candor in his exercise of that discretion.

The court, however, should reject the Government's invitation to project criminal intent into every expenditure that it fails to understand, or that PARIC selectively or retroactively identified as improper. Indeed, one can be certain only that the jury identified as illegal $5,000 as to Count I, and no more than $8,967.12 *total* for Counts II and III *together*. Only by assuming the jury agreed with *every* allegation of impropriety mentioned by the government (and a good many never directly addressed, save for in summaries), would the loss amount jump from $13,967.12 to the unsubstantiated $124,531.62 claimed at trial. But such a jump would be improper, particularly in light of the Government's successful opposition to Brian's *Motion for a Bill of Particulars* and its failure to prove-up these items. Finally, as to expenditures *above* $124,531.62, the Government was provided more than ample time and latitude to disclose, let alone prove, the conduct and necessary intent for any such item(s). It failed to do so.

4

The Presentence Investigation report's *actual* loss total is grossly inflated as well. It includes amounts that were established at trial to be anything *but* fraudulent ($15,232 Lisa Chapman stole or earned, $10,815 pre-approved to entertain a "McKee approved" PARIC insurance agent, and $23,282 in bonus money which was awarded in accord with established PARIC procedures and calculations[2]). Moreover, in lock-step with PARIC and the Government's inability and resulting failure to identify more than a few American Express charges that were criminally fraudulent, the Government and the Presentence Investigation Report simply lump the <u>entire</u> total of $74,815 in to their sum total of $151,427.62[3]. Finally, the Government and the PSI include over $20,998 in Country Club reimbursements when a comprehensive review of the *evidence* establishes only approximately $8,599 in inappropriate expenditures. *See* Exhibit A.

These improper "gross-ups" are an excellent example of why the Government should have rebuked PARIC's invitation to serve as its proxy and convert a legitimate civil case worth somewhere in the low five-figure range, or, better yet, a simple demand for reimbursement, into an expensive tax-payer funded criminal trial. It is also why the two sides were unable to fashion a <u>*reasonable*</u> plea agreement and disposition.

Finally, no one has or can allege that Brian was motivated by malice. Stress and frustration, however, created a sense of entitlement that Brian himself, with the benefit of

---

[2] The error in claiming impropriety with Defendant's bonuses is readily apparent from Defendant's trial Exhibit F, coupled with the testimony of Sharon "Christy" Judd. A review of these items shows very clearly that Defendant's 2013 bonus was paid out assuming a bonus pool of 90 percent. *After* Defendant's termination, and therefore *after* Brian's bonus had been paid in full, the bonus pool was reduced from 90 percent to 70 percent. Unaware that he was about to be fired, Defendant had no input into the amount of his final bonus. To the extent that there was an overpayment made, it was attributable to PARIC, and not to Defendant.

[3] Government agents met multiple times with the drafter of the PSI report during the drafting *process*. Defense counsel was granted a meeting <u>after</u> the drafter submitted his preliminary report, which the drafter then refused to alter in any way.

5

hindsight, condemns with grief.  That said, it is worthy of mention that the majority of the improper expenditures were made for the benefit of other people.

## IV.     IS IMPRISONMENT NECESSARY?

The advisory guidelines provide sterile non-binding guidance to the Court.  That general guidance has been adequately summarized in the PSI report.  As noted by Mark S. Cohen and Scott Wilcox:

> "…[T]he 2015 amendments to the guideline for economic crimes will give courts additional latitude within the sentencing guideline regime, in appropriate cases, to lessen the historically harsh impact of the guideline for economic crime.  Courts should continue to heed the advisory nature of the guidelines, particularly in cases involving economic crime, where the combination of the loss table and specific offense characteristics sometimes leads to double-or-triple-counting of certain factors, causing the defendant's offense level to exceed his or her culpability."

*New York Law Journal*, September 28, 2015.  Under the new guidelines, Brian would be eligible for a sentence of 12 to 18 months with a loss amount below $40,000.  Indeed, one of the most substantive amendments was the distinction between *intended* and *actual* loss amounts.  Even if all of the Presentence Investigation Report's robust $151,000 was found to have provided no value to PARIC, it still includes *less than* $40,000 of intended losses.  But the term of imprisonment under even the new guidelines is ironically aberrant compared to sentences in this District for far more severe cases with greater losses.

Should a gentleman in poor health with no criminal history, who has already been publicly humiliated and consequentially lost over a half of a million dollars in retirement benefits, go to prison as well?  And what if the improper expenditures were atypically modest, totaling less than $40,000.00 over four years?  Assuming his current plight isn't more than enough to dissuade anyone susceptible to deterrence, imprisonment for a short duration *may* still be necessary, at least to satisfy the "sufficient, *but not greater than* necessary" standard of

6

punishment envisioned by 18 U.S.C. § 3553.  But, there are several additional factors that convincingly marshal against the imposition of a term of imprisonment.  They are as follows:

  A. Brian had the courage to inform the Government, and offer to testify to the fact that millions of dollars of PARIC Corporation revenue were diverted for non-PARIC purposes, and subsequently mischaracterized and deducted as corporate expenditures and/or losses.  Many of these funds were diverted to entities controlled by Paul McKee.  Paul McKee, either directly, or through companies that he controls, owns approximately 40 percent of the land that local, state, and federal politicians need for a new federal intelligence agency facility.  [*Missouri power players join forces in effort to keep spy agency within St. Louis borders*, Nicholas J.C. Pistor, St. Louis Post Dispatch] *See* Appendix A-1.  The Government rejected Brian's detailed proffer within 48 hours, refused to offer him *any* downward departure credit, and never followed up with him in any fashion regarding what might be substantial tax fraud[4].

  B. Brian has the support of family, friends and clergy and has served society for years through a voluntary offering of his time and talents[5].

  C. The revised Sentencing Guidelines envision a term of probation as a potentially appropriate sentence for the crimes, criminal history and intended loss amount in this case[6].

  D. While one of the most important tenants of this nation's successful blueprint is the separation of church and state, those who serve its institutions have never been prohibited from acknowledging and responding to the wisdom of its Christian heritage.  Brian stands before the Court in the Jubilee Year of Mercy.  His life as a faithful husband, loving father and neighbor, community servant and productive citizen make him eligible for the small measure of mercy the Government chose not to extend in order to resolve the matter before trial.

---

[4] The outline of Brian's multi-hour proffer to the Government is included as A-2 in the Appendix.
[5] Please see A-3 in the Appendix.
[6] The preliminary amendments were issued on April 9, 2015 and took effect on November 1, 2015.

  E. Brian has and will suffer a devastating financial loss as a result of PARIC's self-serving and belated investigation, his own conduct, and conviction[7].

  F. Brian accepted responsibility for all of the *legitimate* accusations against him, rather than bulk characterizations insisted upon by the Government, and he did not obstruct justice[8].  Although the jury may have weighed some of the evidence against him more heavily than his testimony, Brian spoke truthfully, and should not be penalized for doing so.  An imposition of additional points based upon a so-called obstruction of justice would chill a Defendant's constitutional right to testify on his own behalf.

## V.   RECOMMENDATION

In sum, defense counsels' respectful recommendation is based upon the entirety of the following:

 1. The impact of a term of imprisonment upon Brian's health, wife, children, and community organizations.

 2. The collateral retribution and punishment already imposed, including:

  a. loss of employment

  b. loss of career

  c. loss of severance and retirement funds

  d. public humiliation

  e. stress and cost of litigation

---

[7] Please see A-4 and A-6 in the Appendix.  Please note in particular Joe McKee's testimony that the entire investigation started after he noticed Brian to be in possession of an Enterprise Bank and Trust gift cards valued at over $1,000.  McKee claimed that the gift card stuck him as odd because it was in a denomination that was too large.  He went on to claim that he had told Brian not to order such a large gift card, but Brian had done so anyway.  On cross examination, it was confirmed that McKee himself had ordered these gift cards.

[8] The initial "investigation" commissioned by PARIC purportedly in response to Brian's sudden "abrasiveness" (or challenge to McKee's diversion of corporate revenues) is attached as Appendix 5 (A-5).  PARIC is seeking reimbursement for <u>this</u> irrelevant power point presentation as well.  False testimony by a Government witness regarding PARIC's motives and goals obstruct the pursuit of justice as much or more than defense testimony the Government refuses to believe. Please see A-6 in the Appendix.

    f.  felony conviction;

  3.  Brian's lifetime of law-abiding behavior and consistent service to others;

  4.  The revised Sentencing Guidelines;

  5.  Brian's offer of substantial assistance to the government despite the risk of more retaliation, and;

  6.  Brian's remorse and regret for his conduct.

These factors, taken together, justify a substantial variance from the advisory guidelines.

Based upon the following factors, as well as the gravity of the criminal conduct for which Brian was convicted, his counsel respectfully urges the court to impose the following:

A.  A nominal payment to PARIC's insurer. The losses associated with both the *maximum* conduct now claimed ($151,428.52) plus the maximum purported cost of the internal investigation, internal and external legal services, and prosecution assistance ($402, 378.62)[9] still fall well short of monies to be withheld and/or already recovered by PARIC as a result of the termination of Brian ($676,270)[10];

B.  500 hours of community service; and

C.  18 months of imprisonment, *suspended* and satisfied pending the completion of 100 days of house arrest, and the payment of any restitution, as well as the completion of community service, followed by two years of supervised release.

D.  A fine of $59,000 to the United States for §5E1.2(c)(3) and the cost of supervision.

---

[9] In addition to the $72,000 to a law firm, this sum includes $68,288 for Joe McKee's private investigators. McKee hired them to be present for Brian's termination for being merely abrasive, so the story goes, and was immediately, if not already, commissioned to investigate Brian's relationship with an African-American female-owned business and Mr. Meyer. It netted nothing relevant to the indictment. *Please See* Appendix A-2.

[10] $676,270 – 553,807.14= -$122,462.86 in financial windfall still enjoyed by PARIC, even after all expenses in the Presentence Investigation Report are paid in full. For a detailed description of the $676,270 that PARIC has refused to pay Defendant, see Exhibit B.

9

   E.  A special assessment of $300.00.

Counsel respectfully submits that such a sentence would satisfy the demands of justice and equal the minimum amount of punishment necessary to meet the ultimate goals of the guidelines and these proceedings: an appropriate punishment after meaningful consideration of all of the factors set forth in §3553(a).

           Respectfully submitted,

           COSGROVE LAW GROUP, LLC

            /s/ Burton H. Shostak
           David B. Cosgrove MO Bar # 40980
           Burton H. Shostak MO Bar # 17743
           Luke A. Baumstark MO Bar # 56344
           Pierre Laclede Tower II
           7733 Forsyth Blvd., Suite 1675
           St. Louis, Missouri 63105
           Telephone: (314) 563-2490
           Facsimile: (314) 968-7371
           E-mail:dcosgrove@cosgrovelawllc.com
               bshostak@cosgrovelawllc.com
               lbaumstark@cosgrovelawllc.com

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that on this 13th day of November, 2015, I electronically filed the foregoing with the Clerk of the United States District Court for the Eastern District of Missouri by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

            /s/ Burton H. Shostak